**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 20, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 03-60539

HOUSTON COLLINS; SHARLET BELTON COLLINS; ROBERT EARL COLLINS;
VELMA JEAN COLLINS; DARRELL CALENDER; LARRY VALLIERE; GREGORY
TOLLIVER; SHERMAN TOLLIVER; DWAYNE KEMP, CHRISTOPHER WONG WON,
DETRON BENDROSS, BERNARD VERGIS, ASHLEY GRUNDY, and EDDIE
YOUNGBLOOD, III, Also Known As 2 Live Crew; TIMOTHY VINCENT
YOUNG; PRISCILLA MORRIS; LUTHER JEFFERSON; LEE ESTER CRUMP;
and LINDA CHRISTMAS,

Plaintiffs-Appellees,

versus

FRANK AINSWORTH; ET AL,

Defendants,

FRANK AINSWORTH; BRUCE KIRBY; CHAD SEALS; TROY DAVIS;
TONY HEMPHILL; JOHN GOZA; HAROLD WINTERS; EDDIE GIVENS;
and WILLIAM BROWN,

Defendants-Appellants.

Appeal from the United States District Court
For the Southern District of Mississippi, Jackson

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

    Defendants-Appellants Frank Ainsworth, *et al.* ("Defendants"),

appeal from the district court's denial of their summary judgment

"motion for qualified immunity" in a 42 U.S.C. § 1983 action filed

by Plaintiffs-Appellees Houston Collins, *et al.* ("Plaintiffs"), relating to roadblocks and vehicle checkpoints on the road leading to a concert planned to be held in Copiah County, Mississippi, on June 4, 2000. Defendants argue the district court erred by not granting them qualified immunity because Plaintiffs have failed to offer material facts that demonstrated clearly established constitutional violations and/or objectively unreasonable actions by Defendants.

We find that the Plaintiffs have not put forth material evidence of any constitutional violations committed by Deputies Kirby, Seals, Davis, Hemphill, Goza, Winters, Givens, and Brown. Therefore, the district court erred by not finding these deputies entitled to qualified immunity on all claims as a matter of law. We also find that Plaintiffs have not materially supported any clearly established Fourteenth Amendment violation committed by Sheriff Ainsworth as a matter of law. However, we find that, taking Plaintiffs' facts regarding Sheriff Ainsworth's conduct as true, his actions in connection with the checkpoints were objectively unreasonable in light of clearly established Fourth Amendment law, as to all Plaintiffs, and First Amendment law, as to most Plaintiffs. Therefore, we REVERSE the district court's denial of qualified immunity as to all deputy Defendants on all issues and as to Sheriff Ainsworth on the Fourteenth Amendment issue; we AFFIRM the court's denial of qualified immunity as to Sheriff

Ainsworth on the Fourth Amendment issue; we AFFIRM in part and REVERSE in part the court's denial of qualified immunity as to Sheriff Ainsworth on the First Amendment issue; and we REMAND for proceedings consistent with this opinion.

## BACKGROUND

Plaintiffs Sharlet Belton Collins and Houston Collins (together, the "Collins") produced several concerts in Mississippi under the name S&H Productions from about 1991 to 2000. Some of these concerts were staged at Collins Field, a multi-acre tract of land in rural Copiah County, Mississippi, owned by Plaintiffs Robert Earl Collins and Velma Jean Collins. On or about May 16, 2000, the Collins made arrangements for the rap group 2 Live Crew to give a concert (the "Concert") on Sunday, June 4, 2000, at Collins Field. Collins Field was to open early in the afternoon; and the Concert, which included opening disc jockey acts, was to start at 5:00 or 6:00 p.m. Starting on May 17, 2000, a local radio station began airing ads for the Concert.

Early during the week prior to June 4, 2000, Copiah County Deputy William Brown and two other Copiah County deputies not named as defendants, Andre Davis and Fred Boyd according to Brown, went to the Collins' home. They informed Houston that the sheriff of Copiah County, Frank Ainsworth, did not want the upcoming Concert to proceed. Brown stated that this request was made because of calls Ainsworth had received about foul language and issues related

3

to a previous concert held on Mother's Day. The Collins stated the request was really solicitation for a bribe and retaliation for supporting Ainsworth's political opponent. Ainsworth admitted in a television interview that deputies from his office had warned Houston not to have the Concert. Both Sharlet and Houston Collins stated the message that the Concert was not going to happen was sent by Ainsworth.

Prior to June 4, 2000, Ainsworth had the county attorney contact the state attorney general's office to obtain an opinion concerning the legality of a driver's license checkpoint. Ainsworth claimed that he was concerned that many unlicensed drivers of all ages would be attending the "rock" Concert, which he had heard advertised. He also stated he had received excessive noise, profanity, and trash complaints concerning a previous concert on Mother's Day. Ainsworth stated that no checkpoints had ever been held in connection with county-staged rodeos because he did not think unlicensed drivers would attend rodeo events. He also claimed that he instructed the deputies who would conduct the checks to be courteous and treat people fairly, and to stop each car approaching the checkpoints, regardless if they planned to attend the Concert. Deputies were instructed to make arrests for any criminal violations found in connection with the checkpoints. Ainsworth stated he was the sole policymaker regarding the procedures, customs, and practices used to effectuate the checkpoints.

4

On June 4, 2000, at about 7:00 a.m., a roadblock and vehicle checkpoint had been set up along Old Port Gibson ("OPG") Road leading to Collins Field. There was heavy traffic, and another roadblock and checkpoint were set up later facing the other direction on OPG Road. During the course of the day on June 4, 2000, deputies from Copiah County's Sheriff's Office stopped numerous vehicles at these checkpoints, including those driven by certain Plaintiffs: Houston Collins, Sharlet Collins, Robert Collins, Velma Collins, Darrell Calender, Larry Valliere, Gregory Tolliver, Sherman Tolliver, the members of 2 Live Crew, Timothy Vincent Young, Luther Jefferson, and Lee Esther Crump. Plaintiff Linda Christmas was a passenger in Crump's vehicle that was stopped; Plaintiff Priscilla Morris was a passenger in Jefferson's vehicle that was stopped. Deputies confiscated beer in plain view. Deputies also asked permission to search some of the vehicles; some searches yielded beer and/or marijuana.

Deputies arrested approximately 70 to 80 people, approximately two to three for driver's license infractions, including Larry Valliere, but many more for the illegal possession of beer. These arrestees, including Darrell Calender, Larry Valliere, Gregory Tolliver, Sherman Tolliver, Luther Jefferson, and Priscilla Morris, were detained overnight at the Copiah County detention center. Ainsworth had instructed that no one could be released until the morning – Monday, June 5, 2000. There is evidence that thunderstorms set in that night and two judges were brought in the

5

next morning for Plaintiffs to make bond.  The large number of detainees exceeded the jail's capacity, which was approximately 50 people.

The rap group 2 Live Crew did not perform at the Concert. There is evidence the cancellation may have been due to the checkpoint incident upsetting them, because of the roadblocks "scaring off" concertgoers, because Sharlet Collins felt ill, or because of the weather.  It appears some of the opening deejay acts did perform at the Concert, starting around 1:00 or 2:00 p.m.

Plaintiffs, who are African-American, filed this § 1983 suit in district court on February 5, 2001.  Plaintiffs included the Concert promoters, Houston and Sharlet Collins; the owners of Collins Field, Robert and Velma Collins; the members and managers of 2 Live Crew, Dwayne Kemp, Christopher Wong Won, Detron Bendross, Bernard Vergis, Ashley Grundy, and Eddie Youngblood, III; vendors who were going to sell food at the Concert, Gregory Tolliver and Sherman Tolliver; and certain would-be concertgoers, all other Plaintiffs.  Defendants included Copiah County Sheriff Ainsworth, and Copiah County Deputies Brown, Kirby, Seals (whose actual last name is Sills[1]), Davis, Hemphill, Goza, Winters, and Givens, who were all sued in their individual and official capacities. Plaintiffs made various allegations about how Defendants' actions at the roadblock and associated checkpoint stops violated their

---

[1]We refer to Deputy Sills throughout as Seals, as indicated in the cause's caption.

Fourth and First Amendment rights. Those Plaintiffs who were arrested at the checkpoints and taken to jail alleged that their Fourteenth Amendment due process rights were violated because they were not permitted to make bail within 24 hours of being arrested and were detained in an overcrowded jail.

Defendants filed a motion seeking qualified immunity, arguing that Plaintiffs had not shown that Defendants had taken any specific actions that violated Plaintiffs' constitutional rights. Plaintiffs did not specifically respond to this motion, other than submitting a jail log that showed certain Plaintiffs had been arrested the day of the concert and the Minutes of a 1966 meeting of the Copiah County Board of Supervisors recording the Board's decision to permit the sale and possession of "alcoholic liquors" in Copiah County.[2] Plaintiffs then filed a cross-motion for summary judgment, including depositions from Ainsworth, Brown, Givens, Seals, Davis, Sharlet Collins, and Houston Collins. Plaintiffs then supplemented with a news report videotape exhibit and answers to interrogatories. Defendants filed a reply that to the extent Plaintiffs' filing could be a response to Defendants'

_____

[2]Under Mississippi law, counties can elect whether to allow the legal possession of alcoholic beverages, or light wine and beer. *See* Miss. Code Ann. §§ 67-1-1 *et seq.*, 67-3-1 *et seq.* (2003); *Dantzler v. State*, 542 So. 2d 906, 909 (Miss. 1989). In Copiah County, possession of beer is a chargeable offense, *Mayo v. State*, 843 So. 2d 739, 740 (Miss. Ct. App. 2003), even though possession of hard liquor appears to be permitted. Thus, the "alcoholic liquors" referenced in the Copiah County Board's minutes appear to refer to alcoholic beverages as opposed to light wine and beer.

7

motion for qualified immunity, Plaintiffs had not shown Defendants were not entitled to qualified immunity because Plaintiffs had offered no evidence of the violation of any constitutional rights. Without any analysis, the district court denied qualified immunity to all Defendants. In that order, the district court also denied Plaintiffs' cross-motion for summary judgment. Defendants timely filed the instant interlocutory appeal to challenge the district court's denial of qualified immunity.

## DISCUSSION

### Jurisdiction over and standard of review of summary judgment motions predicated on qualified immunity.

First, this Court must decide whether Defendants' motion for qualified immunity should be considered a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or a motion for summary judgment under Federal Rule of Civil Procedure 56. The district court was presented with documentary evidence relevant to the qualified immunity issue. Although the court did not state it was relying on these documents in making its decision, it did reject Plaintiffs' cross-motion for summary judgment based on its finding that there were genuine issues of material fact precluding summary judgment. Plaintiffs had filed their documentary evidence in support of this motion, which must have been reviewed by the district court. Therefore, the denied motion for qualified immunity is treated as a denial of a motion for summary judgment. *See **Fernandez-Montes v. Allied Pilots Ass'n***, 987 F.2d 278, 283 n.7

8

(5th Cir. 1993) (noting that when matters outside the pleadings are considered, a motion to dismiss should be construed as a motion for summary judgment).

This Court has interlocutory jurisdiction to determine the legal question of whether Plaintiffs' summary judgment facts state a § 1983 claim under clearly established law. *See* **Nerren v. Livingston Police Dep't**, 86 F.3d 469, 472 (5th Cir. 1996); *see also* **Mitchell v. Forsyth**, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."). When a district court denies an official's motion for summary judgment based on qualified immunity, the court is considered to have made two distinct determinations, even if only implicitly. **Kinney v. Weaver**, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). "First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law." **Id.** "Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." **Id.** On interlocutory appeal, we do not have jurisdiction to challenge the district court's assessments regarding the sufficiency of the evidence; instead we review "the purely legal question whether a given course of conduct would be objectively

9

unreasonable in light of clearly established law." *Id.* at 347.

Therefore:

> [W]e have jurisdiction only to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts. As one of our cases succinctly puts it, "we can review the *materiality* of any factual disputes, but not their *genuineness*."

*Id.* (quoting *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)).

Unlike in appeals of most summary judgment rulings where we would employ *de novo* review, applying the same Rule 56 standard used by the district court, in the context of a denial of qualified immunity we "consider[] only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney*, 367 F.3d at 348. Any factual disputes that exist in a qualified immunity appeal are resolved in favor of Plaintiffs' version of the facts. *Id.; Wagner*, 227 F.3d at 320 ("Even where, as here, the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiff's version of the facts is true . . . ."). Where, as here, the district court failed to set forth the specific factual disputes that precluded granting summary judgment based on qualified immunity, we "review the record in order 'to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed.'" *Kinney*, 367 F.3d at 348 (quoting *Johnson*

10

*v. Jones*, 515 U.S. 304, 319 (1995)).

This Court conducts a bifurcated analysis to assess the defense of qualified immunity. *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001). First, Plaintiffs must allege that Defendants violated their clearly established constitutional rights. *Id.* Constitutional law can be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope v. Peltzer*, 536 U.S. 730, 740 (2002) (internal quotations omitted). Second, if Plaintiffs have alleged such a violation, this Court must consider whether Defendants' actions were objectively reasonable under the circumstances. *Bazan*, 246 F.3d at 490; *see also* *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). That is, this Court must decide whether reasonably competent officers would have known that their actions violated law which was clearly established at the time of the disputed action. *Bazan*, 246 F.3d at 490. "[L]aw enforcement officers who reasonably but mistakenly commit a constitutional violation are entitled to immunity." *Id.* at 488 (internal quotations and citation omitted).

**Clearly established Fourth Amendment law.**

The first claim Plaintiffs make is a Fourth Amendment claim, that the roadblock and driver's license checkpoints amounted to an

11

impermissible search and seizure.  The Supreme Court has held:

> [E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Delaware v. Prouse*, 440 U.S. 648, 663 (1979).  *Prouse* invalidated a discretionary, suspicionless stop for a spot check of a single motorist's license and registration; however, the Court indicated that "[q]uestioning of all oncoming traffic at roadblock-type stops" to verify driver's licenses and registrations would be a lawful means of furthering the vital interest in highway safety. *Id.; see also* *City of Indianapolis v. Edmond*, 531 U.S. 32, 39 (2000) (noting same).[3]

The Supreme Court in *Brown v. Texas*, 443 U.S. 47 (1979), further articulated the balancing test used to determine the reasonableness of a seizure in the context of a suspicionless stop of a man who was walking in an alley:  "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizures, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."  *Id.* at 50-51.

---

[3] To that end, in Mississippi roadblocks where all incoming traffic is stopped for a driver's license check have been found permissible under the Fourth Amendment.  *Miller v. State*, 373 So. 2d 1004, 1005 (Miss. 1979).

There, the Court, citing **Prouse**, invalidated a Texas statute making it a crime to refuse to identify oneself to a peace officer because "[i]n the absence of any basis for suspecting . . . misconduct, the balance between the public interest [in crime prevention] and appellant's right to personal security and privacy tilts in favor of freedom from police interference." **Brown**, 443 U.S. at 51-53.

This type of balancing test has also been repeatedly utilized in the context of suspicionless vehicle checkpoint stops. Though decided before **Prouse** and **Brown**, the Supreme Court in **United States v. Martinez-Fuerte**, 428 U.S. 543, 555, 566-67 (1976), balanced the public interest in intercepting illegal aliens against individual plaintiffs' Fourth Amendment privacy interests to explicitly permit brief, suspicionless seizures at fixed Border Patrol checkpoints to inquire about citizenship. Citing **Martinez-Fuerte** and the test outlined in **Brown**, the Court has also allowed sobriety checkpoints aimed at removing drunk drivers from the road, finding the balance to weigh in favor of the public interest in preventing drunk driving. **Michigan Dep't of State Police v. Sitz**, 496 U.S. 444, 450, 455 (1990). In the most recent checkpoint case, **Edmond**, the Court found a checkpoint program primarily designed to interdict illegal narcotics to contravene the Fourth Amendment because unlike the permissible, tailored public concerns of policing the border in **Martinez-Fuerte** or ensuring road safety in **Sitz**, the drug checkpoints served the impermissible programmatic purpose of

13

detecting evidence of ordinary criminal wrongdoing. 531 U.S. at 41-42, 48. *Edmond* reemphasized that "our cases dealing with intrusions that occur pursuant to a general scheme absent individualized suspicion have often required an inquiry into purpose at the programmatic level." *Id.* at 46. *Edmond* also reemphasized that this inquiry requires examination of available evidence to determine the programmatic purpose of the checkpoint. *Id.*

It is therefore clearly established that this Court is to examine the available evidence to determine the programmatic purpose of the checkpoint implicating the Fourth Amendment. Then we subject such checkpoint to a balancing test to determine whether it is constitutionally permissible – weighing the public interest, if any, advanced by the checkpoint against individual Plaintiffs' protected privacy and liberty interests.

**Clearly established First Amendment law.**

The second claim Plaintiffs make is a First Amendment prior restraint claim. Live musical entertainment such as the Concert is unquestionably speech and expression subject to the guarantees of the First Amendment. *See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); *McClure v. Ashcroft*, 335 F.3d 404, 409 (5th Cir. 2003) (citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981)); *see also Southeastern Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016, 1020 (5th Cir. 1972) (noting that

14

presenting the musical "Hair" at a municipal auditorium is constitutionally protected). Implicit in the right to engage in First Amendment-protected activities is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). When public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of prior restraints exists. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

Although prior restraints are not unconstitutional *per se*, any system of prior restraint is weighted with a strong presumption of constitutional infirmity. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The Supreme Court has explained:

> The presumption against prior restraints is heavier – and the degree of protection broader – than that against limits on [obscene] expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Conrad*, 420 U.S. at 558-59. "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system."

15

*Id.* at 559 (citation and internal quotation marks omitted) (describing prompt judicial review). It is thus clearly established that if public officials abuse their discretionary power to deny in advance use of a forum for First Amendment-protected expression without enacting proper safeguards, this constitutes an impermissible prior restraint.

**Clearly established Fourteenth Amendment law.**

Finally, Plaintiffs who were arrested as a result of the checkpoints and detained at Copiah County jail make a due process claim related to the imposed delay in their making bail and their confinement in cramped conditions. Under Mississippi law, arrested persons must be permitted to make bail or bond within 48 hours of arrest. *Quinn v. Estate of Jones*, 818 So. 2d 1148, 1152 (Miss. 2002) (citing Uniform Circuit and County Court Rule 6.03: "[E]very person in custody shall be taken, without unnecessary delay and within 48 hours of arrest, before a judicial officer or other person authorized by statute for an initial appearance."); *see also Evans v. State*, 725 So. 2d 613, 643 n.2 (Miss. 1997) (citing same).

Overcrowding of persons in custody is not *per se* unconstitutional. *See Rhodes v. Chapman*, 452 U.S. 337, 347-50 (1981). However, the Fourteenth Amendment prohibits the "imposition of conditions of confinement on pretrial detainees that constitute 'punishment.'" *Hamilton v. Lyons*, 74 F.3d 99, 103 (5th Cir. 1996) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In

16

*Hamilton*, where a detainee alleged he was denied visitation, telephone access, recreation, mail, legal materials, sheets, and showers for a three-day period, this Court found such treatment did not amount to punishment to give rise to a constitutional claim. 74 F.3d at 106 (citing *Bell* for proposition that the Constitution is not concerned with a "*de minimis* level of imposition" on pretrial detainees). This Court applies the *Bell* test to assess pretrial detainee due process claims:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." [Footnote omitted.] Conversely, if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

441 U.S. at 539. "[T]his test is deferential to jail rulemaking; it is in essence a rational basis test of the validity of jail rules." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 646 (5th Cir. 1996) (describing *Bell* test). Thus, it is clearly established that pretrial detainees' due process rights are violated when they are subjected to conditions of confinement that constitute punishment which are not reasonably related to a legitimate governmental objective.

**Whether individual Defendants Kirby, Hemphill, Goza, Winters, Seals, and Givens are entitled to qualified immunity.**

Based on the summary judgment record evidence, Plaintiffs have

not shown that Deputies Hemphill, Goza, Winters, Seals, and Givens had any particular material interaction whatsoever with any particular Plaintiff.

Deputy Seals stated he was informed the purpose of the checkpoint was to check the driver's license of each person who came through a checkpoint, no matter his destination; Seals checked fewer than 100 licenses and aided in only one arrest of an older Caucasian man for possession of beer.

Deputy Givens stated the Copiah County Sheriff's Department followed state policy for conducting driver's license checkpoints. According to this policy, as outlined in an opinion from the state attorney general, deputies could not randomly stop cars but had to follow a uniform pattern. Here, all vehicles were to be stopped regardless of their destination. Givens stated he was present at the checkpoint in a supervisory capacity. He checked a few driver's licenses but did not arrest anyone.

None of the other deputies' deposition testimony indicates any particular interaction by these deputy Defendants with any particular Plaintiff.

Sharlet Collins stated that she was aware Plaintiff Priscilla Morris had been arrested in connection with the roadblock but could not say by which officer. Sharlet stated Plaintiff Eddie Youngblood, III had been "harassed" at the checkpoint but could not say by which officers. Sharlet stated she was not arrested but was asked for identification each time she passed through the

18

roadblock; unnamed officers asked to search her trunk once, but she could not remember if they did.

Houston Collins stated that officers asked for his driver's license several times that he passed through the roadblock, and also asked him if he had anything illegal in his car and if they could search it, but he could not remember any officers' names. At one point, unknown officers searched his trailer. Houston was not arrested and said he had not heard of or spoken with many of the deputy Defendants. He stated that the officers made comments regarding the checkpoints being "the sheriff's doing" and that the officers did not know why they were there. Houston also stated in the videotape that deputies conducting the checkpoints stopped every car.

There is no evidence put forth by Plaintiffs as to any of these deputy Defendants having, using, or abusing their public official discretion to deny use of a forum for First Amendment-protected expression as a prior restraint, nor to any specific mistreatment by these deputy Defendants regarding Plaintiffs' ability to make bond or crowded jail conditions.

Thus, the evidence does not show that the specific actions of these deputy Defendants violated any clearly established constitutional rights of Plaintiffs. Taking Plaintiffs' evidence as true, because Deputies Kirby, Hemphill, Goza, Winters, Seals, and Givens did not take any particular actions with regard to particular Plaintiffs, the district court erred in assessing the

19

legal significance of the conduct that the court deemed sufficiently supported for purposes of denying summary judgment based on qualified immunity. Therefore, these Defendants are entitled to qualified immunity as a matter of law on all claims.

**Whether individual Defendants Davis and Brown are entitled to qualified immunity.**

Based on the summary judgment record evidence, Plaintiffs have not shown that Deputies Davis and Brown had any material interaction with any Plaintiff that amounted to the allegation of any constitutional violation.

Deputy Davis stated that the morning of the checkpoint, deputies were informed that the purpose of the checkpoint was to check driver's licenses, and not to ask additional questions of drivers who had valid licenses. Davis said he checked hundreds of licenses and made inquiries of those drivers who had beer in plain view. Davis did not search any trunks and did not hear of other officers requesting to do so, although he did unsuccessfully request to search one vehicle whose occupants were smoking marijuana. Davis arrested about 50 people that day, and the total number of arrestees was between 70 and 100. Davis stated these people could not make bond till the next morning but did not know whether this was pursuant to Sheriff Ainsworth's orders. Davis did not know how many people were already being held at the jail when the checkpoint arrestees were brought in. Davis arrested Plaintiff Sherman Tolliver, who was charged with possession of beer and

20

marijuana, and with contributing to the delinquency of a child who was a passenger in Tolliver's car. Davis also arrested Plaintiff Gregory Tolliver for possession of beer but did not recall whether he was in the same car as Sherman.

Deputy Brown stated that he remembered going to the Collins' home prior to June 4, 2000. Sheriff Ainsworth had asked Brown to speak with the Collins and request they not have the Concert due to complaints from the prior concert. Brown stated Ainsworth did not tell him why the checkpoint was being set up but did instruct deputies to be courteous and treat people fairly. Brown stated he only stopped one Caucasian man, confiscated his beer, and arrested him.

Both the Collins recounted the visit to their home by Brown and two other officers. Sharlet indicated the message that the planned Concert "ain't going to happen" came from Ainsworth. Houston stated that Brown said he did not know why Ainsworth did not want the Concert to occur. Houston stated that an officer Bauer or Boyer told him that Ainsworth would not let the Concert occur because Houston had not agreed to share any Concert proceeds with Ainsworth. Houston stated the three deputies who came to their house said they were "just delivering a message." Sharlet also stated that at some point on June 4 Brown asked her to leave the checkpoint area, which may or may not have been while she was videotaping and/or photographing the scene.

There is no evidence put forth by Plaintiffs as to either

21

Davis or Brown having, using, or abusing their public official discretion to deny use of a forum for First Amendment-protected expression as a prior restraint, nor to any specific mistreatment by these deputy Defendants regarding Plaintiffs' ability to make bond or crowded jail conditions.

Thus, the evidence does not show that the actions of these deputy Defendants amounted to a violation of any clearly established constitutional rights of Plaintiffs. Plaintiffs put forth no evidence that Davis's particular arrests of Sherman and Gregory Tolliver were unlawful or carried out in any violative way; also, Davis was unaware that the checkpoint might have had any purpose other than to check driver's licenses. Plaintiffs put forth no evidence that Brown stopped any of them at the checkpoints. While Brown delivered a message from Ainsworth to the Collins that Ainsworth did not want the Concert to take place, and directed Sharlet to leave the checkpoint area, such actions by themselves did not violate Plaintiffs' constitutional rights. Taking Plaintiffs' evidence as true, because Deputies Davis and Brown took only limited actions with regard to Plaintiffs – no action that amounted to any violation of Plaintiffs' constitutional rights – the district court erred in assessing the legal significance of the conduct that the court deemed sufficiently supported for purposes of denying summary judgment based on qualified immunity. Therefore, these Defendants are entitled to qualified immunity as a matter of law.

## Whether individual Defendant Ainsworth is entitled to qualified immunity.

Based on the summary judgment record evidence, Plaintiffs have shown that Sheriff Ainsworth had material interactions relating to the checkpoints which amounted to the allegation of a Fourth Amendment violation, as to all Plaintiffs, and a First Amendment violation, as to most Plaintiffs, but not a Fourteenth Amendment violation.

Sheriff Ainsworth stated that he had heard advertisements about the (what he classified as a "rock") Concert and was concerned that many young and old unlicensed drivers would be attending. Ainsworth said he based this concern on "[j]ust prior experience and being a sheriff." Ainsworth had the county attorney contact the state attorney general's office to obtain an opinion regarding the legality of a driver's license checkpoint. Ainsworth stated he instructed the deputies conducting the checkpoints to be courteous, and to stop each car that approached a checkpoint on OPG Road. There were two checkpoints due to the high volume of cars traveling toward Collins Field. Checkpoints had previously been set up on OPG Road, but they had never been set up for rodeos; Ainsworth also stated he had never worked a rock concert as a sheriff before. Ainsworth stated the first people stopped were Caucasian; and about 70 to 80 people were arrested at the checkpoints, taken to the jail, and held until the next morning. Ainsworth had instructed officers that the arrestees were not to be

23

released until the next day. Ainsworth stated that his Sheriff's Office had received complaints about a previous Collins Field concert involving profanity, noise, and trash dumping. Ainsworth admitted that he had sent a warning through his deputies to the Collins not to hold the Concert; deposition testimony from Brown and the Collins confirms this.

Sharlet Collins stated the message that they received from Brown about canceling the Concert came from Ainsworth, and the roadblock was retaliation for the Collins' supporting Ainsworth's opponent in the previous election. Ainsworth stated he did not know who the Collins had supported. Houston Collins also stated the message was sent by Ainsworth and that Ainsworth did not want the Concert to take place unless Ainsworth received some payback of the proceeds.

Both checkpoints were located on OPG Road. Deposition testimony indicates the location of the checkpoints to be at opposite sides just outside the entrance gates of Collins Field and the Concert.

**Fourth Amendment violation.**

Plaintiffs argue one actual programmatic purpose of the checkpoints was to detect evidence of ordinary criminal wrongdoing, which as the Supreme Court stated in **Brown**, 443 U.S. at 51-53, and confirmed in **Edmond**, 531 U.S. at 41-42, 48, is an impermissible purpose in suspicionless stops. The summary judgment record

24

evidence does not show this to be an actual purpose pursued by Defendants. The deputies' testimony shows the purpose declared by Ainsworth to be checking for unlicensed drivers. The only evidence as to confiscation of beer and/or marijuana demonstrates that deputies were told to take, and did take, such items only when discovered in plain sight or when a search was consented to. Thus, the purpose of ordinary crime prevention or detection is not materially supported by the evidence.

Plaintiffs also put forth the argument, which is amply supported by the record, that another programmatic purpose of the checkpoint was to stop the Concert from occurring, and that Ainsworth unconstitutionally enforced driver's license checkpoint law to accomplish this goal. Ainsworth maintains he is entitled to qualified immunity because the checkpoints were constitutionally proper. The checkpoints were a legitimate exercise of the government's power to regulate drivers for safety reasons. Ainsworth also points to the fact that he sought and relied on an opinion regarding the legality of driver's license checkpoints from the attorney general's office.

However, taking Plaintiffs' summary judgment evidence as true, the record indicates that Sheriff Ainsworth was pursuing the programmatic purpose of discouraging the Concert from taking place when he set up and conducted the checkpoints on OPG Road leading to Collins Field. Though Ainsworth claims the checkpoints were set up to advance general highway safety, and the checkpoints may have

25

been facially valid pursuant to Mississippi law and under *Prouse*, 440 U.S. at 663, as reindicated in *Edmond*, 531 U.S. at 39, Plaintiffs have put forth material evidence that shows another programmatic purpose which was advanced by Sheriff Ainsworth. Whether it be because Ainsworth did not want to receive complaints about another concert, the Collins had not supported him in the prior election, or Ainsworth wanted to elicit a bribe, discouraging the Concert from happening was an impermissible programmatic purpose.

It is clear that the checkpoints at issue were seizures implicating the Fourth Amendment. *Sitz*, 496 U.S. at 450; *see also* *Martinez-Fuerte*, 428 U.S. at 556 ("It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment."). Under the *Brown* balancing test we consider the reasonableness of those seizures. *Sitz*, 496 U.S. at 450. Although there is no evidence disputing that promoting highway safety is a legitimate public concern, Plaintiffs have advanced evidence that the actual primary purpose of the stops was the impermissible nonpublic concern of suppressing the Concert. It is true that the evidence shows a few unlicensed drivers were removed from the highway after being stopped at the checkpoints. *See, e.g., id.* at 454-55 (finding the removal of two drunk drivers from 126 persons stopped at a sobriety checkpoint to be enough to effectively advance the public interest). However, it is also true that the headline act

26

2 Live Crew did not perform at the Concert.  Thus, the checkpoints were also effective at advancing their impermissible programmatic purpose.  Though the intrusion on most individuals stopped at the checkpoints appears to have been brief and not severe, *see* **id.** at 452-53, in light of the improper programmatic goal and effect of stopping the Concert, we find the **Brown** balancing test weighs in favor of the unreasonableness of the checkpoints.

Plaintiffs have thus clearly alleged that Ainsworth's conduct in connection with the checkpoints constituted a violation of their Fourth Amendment rights.  Moreover, an objectively reasonable officer would or should have known that discouraging a First Amendment-protected musical performance – *see, e.g.,* **Ward**, 491 U.S. at 790; **Schad**, 452 U.S. at 65 – would not constitute a legitimate public interest such that the **Brown** balancing test used to determine the constitutionality of suspicionless checkpoint stops would weigh in favor of Plaintiffs' personal Fourth Amendment interests under clearly established law. We find that, under these circumstances, no sheriff could reasonably believe his actions aimed at stopping the Concert were legal and would entitle him to qualified immunity.  Therefore, the district court was correct in its assessment of the legal significance of Ainsworth's conduct that the court deemed sufficiently supported the denial of summary judgment based on qualified immunity on the Fourth Amendment claim.

**First Amendment prior restraint violation.**

27

Plaintiffs argue that Ainsworth's warning that the concert was not going to occur, coupled with the setup of the checkpoints themselves, amounted to a prior restraint on the Concert and thus infringed their rights of free expression and association. Ainsworth responds that the checkpoints were entirely legitimate and did not constitute a prior restraint.

For essentially the same reasons we find no error in the district court's denial of qualified immunity against Ainsworth on the Fourth Amendment issue, this Court agrees with Plaintiffs. Plaintiffs presented evidence that after failing to dissuade the Concert sponsors from proceeding with their plans for the 2 Live Crew event, Ainsworth chose to erect an indirect (but fully effective) bar in the guise of a facially valid pair of driver's license checkpoints on either side of OPG Road, flanking the only entrance to Collins Field. By setting up these checkpoints to stop the Concert from taking place, Ainsworth abused his discretionary power to deny in advance the use of Collins Field for First Amendment-protected musical expression and association. No procedural safeguards were put in place to prevent censorship of legitimate speech and music. Therefore, we find Ainsworth's use of the driver's license checkpoints amounted to an impermissible prior restraint on the Concert.

Most Plaintiffs thus have clearly alleged a constitutional violation by Ainsworth. As to most Plaintiffs, we find under these circumstances that no sheriff could reasonably believe his actions

28

aimed at stopping the Concert were legal and would entitle him to qualified immunity. Therefore, the district court was correct in its assessment of the legal significance of Ainsworth's conduct that the court deemed sufficiently supported the denial of summary judgment on the First Amendment claim as to most Plaintiffs.

However, we find no evidence in the summary judgment record indicating that Plaintiffs Darrell Calender, Priscilla Morris, and Luther Jefferson had any intentions to attend the Concert. Thus, these Plaintiffs have not clearly alleged a First Amendment violation. Sheriff Ainsworth is entitled to qualified immunity on the First Amendment issue as to these Plaintiffs.

**Fourteenth Amendment violations.**

Finally, Plaintiffs who were arrested and held at Copiah County's detention center argue that they were denied their right to make bail within 24 hours and were incarcerated in unsuitable conditions. Defendants contend there is no evidence that Plaintiffs were subjected to unconstitutional conditions amounting to punishment. The summary judgment record evidence does not support Plaintiffs' allegations of due process violations related to the timing of their bail or the conditions of their confinement.

There is no right to post bail within 24 hours of arrest. Mississippi law indicates that this limitation is 48 hours. *Quinn*, 818 So. 2d at 1152; *Evans*, 725 So. 2d at 643 n.2. There is no evidence presented by Plaintiffs that their posting bail on Monday

29

morning after being detained on Sunday exceeded the 48-hour limit. The only evidence indicates two judges were brought to the jail Monday morning to bond out detained Plaintiffs.

Likewise, while there is evidence that Copiah County jail exceeded capacity for much of the duration of Plaintiffs' stay, there is nothing to indicate that unsanitary or unsuitable conditions amounting to punishment resulted. Plaintiffs advanced no summary judgment evidence to back their claims that they were not granted mattresses and phone calls during their overnight stay. This Court did not find unconstitutional punishment conditions in *Hamilton*, 74 F.3d at 106, where a pretrial detainee was denied telephone access, recreation, mail, showers, and sheets for a three-day period; in fact, we affirmed the district court's decision to dismiss Hamilton's § 1983 conditions of confinement claim. *Id.* at 107. Similarly, even if we assume as true evidence Plaintiffs have not put forth, detained Plaintiffs who were not granted phone calls and mattresses for a period of less than 24 hours were not subjected to impermissible punishment. If we assume as true evidence Plaintiffs have not put forth, it appears arrested Plaintiffs were merely exposed to a "*de minimis* level of imposition." *Id.* at 106.

There is evidence that Ainsworth authorized that Plaintiffs be held until the morning of June 5, 2000. However, the only reasons for the cramped conditions advanced by Defendants, which Plaintiffs

30

have not rebutted, relate to the inability to get judges out to the jail late on Sunday to post bond and the bad weather conditions. These are legitimate, practical concerns reasonably related to the overcrowding conditions; they easily meet the deferential, rational basis **Bell** test. *See* **Bell**, 441 U.S. at 539; **Hare**, 74 F.3d at 646.

Taking Plaintiffs' sparse evidence as true, because the evidence does not show that the actions of Sheriff Ainsworth in keeping them overnight at the jail subjected Plaintiffs to conditions of confinement that constitute unconstitutional punishment of pretrial detainees which were not reasonably related to a legitimate government objective, the district court erred in assessing the legal significance of the conduct that the court deemed sufficiently supported for purposes of denying summary judgment based on qualified immunity. Therefore, Ainsworth is entitled to qualified immunity as a matter of law on the Fourteenth Amendment due process claims.

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and arguments, and for the reasons set forth above, we conclude that Plaintiffs have not materially alleged any clearly established constitutional violations by deputy Defendants; they are entitled to qualified immunity as a matter of law. We also conclude that Plaintiffs have not materially alleged any clearly established Fourteenth Amendment violation by Defendant

31

Sheriff Ainsworth and he is entitled to qualified immunity as a matter of law on this issue. However, Plaintiffs have materially alleged that Ainsworth's conduct in connection with the checkpoints violated clearly established Fourth Amendment law, and this Court finds his actions objectively unreasonable under the circumstances. Plaintiffs, except Darrell Calender, Priscilla Morris, and Luther Jefferson, have also materially alleged that Ainsworth's conduct violated clearly established First Amendment law, and this Court finds his actions objectively unreasonable under the circumstances. Therefore, we REVERSE the district court's denial of qualified immunity as to all deputy Defendants; we REVERSE the district court's denial of qualified immunity to Sheriff Ainsworth on the Fourteenth Amendment issue, as to all Plaintiffs, and on the First Amendment issue, as to Plaintiffs Calender, Morris, and Jefferson; we AFFIRM the court's denial of qualified immunity as to Sheriff Ainsworth on the Fourth Amendment issue, as to all Plaintiffs, and on the First Amendment issue, as to all Plaintiffs except Calender, Morris, and Jefferson; and we REMAND for proceedings consistent with this opinion.

**REVERSED** in part, **AFFIRMED** in part, and **REMANDED**.