REVISED JUNE 5, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 6, 2009

Charles R. Fulbruge III
Clerk

No. 08-30512

CLUB RETRO LLC; LYLE K DOUBLET, Individually and as Manager, on behalf of Club Retro LLC; ERICA L DOUBLET Individually and on behalf of Olivia Lynn Marie Doublet; DAR J DOUBLET; CHRISTINE A SMITH, Individually and on behalf of Carley A Smith; RONNIE M MABOU; JONATHAN K FROST

                                    Plaintiffs - Appellees

v.

WILLIAM EARL HILTON, Individually and in His Official Capacity as Sheriff of Rapides Parish; MICHAEL SLOCUM, Individually and In His Official Capacity as a Deputy Sheriff of Rapides Parish; RICKY DOYLE, Individually and in His Official Capacity as a Deputy Sheriff of Rapides Parish; MICHAEL LACOUR, Individually and in His Official Capacity as a Deputy Sheriff of Rapides Parish; JAMES RAULS, Individually and In His Official Capacity as a Deputy Sheriff of Rapides Parish

                                    Defendants - Appellants

Appeal from the United States District Court
for the Western District of Louisiana

Before KING, BENAVIDES, and CLEMENT, Circuit Judges.

KING, Circuit Judge:

Defendants, the Sheriff of Rapides Parish and four deputy sheriffs, appeal the district court's denial of qualified immunity for their involvement in "Operation Retro-Fit," a preplanned, violent S.W.A.T. team raid of a nightclub,

Club Retro, on February 5, 2006. As a result of events that occurred during that raid, plaintiffs, owners and select employees of Club Retro, bring 42 U.S.C. § 1983 and state law claims against those five officers in their individual and official capacities. Relevant to this appeal, they allege that defendants' planning, approving, and executing Operation Retro-Fit violated their First, Fourth, Fifth, and Fourteenth Amendment rights. Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting, inter alia, qualified immunity as an affirmative defense to the individual-capacity claims. The district court rejected the defense of qualified immunity for all but a few of plaintiffs' claims. It, however, granted qualified immunity for plaintiffs' due process claims, which it dismissed without prejudice. Defendants bring this interlocutory appeal challenging the district court's denials of qualified immunity and decision to dismiss the due process claims without prejudice. For the following reasons, we affirm the district court's order in part, reverse in part, and remand.

## I. PROCEDURAL BACKGROUND AND FACTUAL ALLEGATIONS

### A. Procedural History

A year after enduring the raid on Club Retro, plaintiffs Club Retro, L.L.C.; Lyle K. Doublet; Dar J. Doublet; Erica L. Doublet, individually and on behalf of her minor daughter, Olivia Lynn Marie Doublet; Christine A. Smith, individually and on behalf of her minor daughter, Carley A. Smith; Jonathan K. Frost; and Ronnie M. Mabou filed a federal lawsuit. Their complaint alleged, inter alia, § 1983 claims of violations of their freedoms of expression, association, and assembly under the First Amendment, unlawful search and seizure and false arrest under the Fourth Amendment, and equal protection and due process

violations under the Fourteenth Amendment.[1] They alleged these claims against defendants Rapides Parish Sheriff William Hilton and Rapides Parish deputy sheriffs Michael Slocum, Ricky Doyle, Michael LaCour, and James Rauls, acting in their individual and official capacities. Defendants immediately moved to dismiss the complaint under Rule 12(b)(6) on various grounds, including qualified immunity for the federal constitutional claims against them in their individual capacities. Plaintiffs responded to the motion to dismiss by filing a response and a motion to amend or correct their complaint. The court referred the motion to dismiss and motion to amend or correct the complaint to a magistrate judge. The magistrate judge granted plaintiffs' motion to amend or correct their complaint. Plaintiffs filed a supplemental and amending complaint which amended parts of the complaint (collectively, the "amended complaint"), and defendants reasserted their motion to dismiss.

The magistrate judge issued a report recommending that the district court grant in part and deny in part the motion to dismiss. It stated, inter alia, that the district court should reject the defense of qualified immunity (1) to all defendants for plaintiffs' Fourth Amendment unreasonable search and seizure claims; (2) to deputy sheriffs Slocum and Doyle for Dar's, Lyle's, and Erica's Fourth Amendment false arrest claims; and (3) to Sheriff Hilton and deputy sheriffs Slocum, LaCour, and Rauls for plaintiffs' Fourteenth Amendment equal protection claims. On the other hand, the magistrate judge recommended dismissal of Club Retro's, Lyle's, and Dar's First Amendment and plaintiffs' due process claims based on qualified immunity. After the parties filed objections to

---

[1] The complaint also alleged, inter alia, false arrest, defamation, and business interference in violation of state laws.

the report and recommendation, the district court entered judgment, adopting most of the magistrate judge's recommendations but—without substantial comment—refusing to dismiss the First Amendment claims. The district court dismissed without prejudice plaintiffs' due process claims.

Defendants filed a timely appeal. Because this case comes to us on appeal from the district court's order denying defendants' motion to dismiss, we consider the facts that plaintiffs set forth in their amended complaint.

B. Factual Allegations

Lyle and Dar Doublet were the owners of Club Retro, L.L.C., a business enterprise that owned and operated Club Retro, a nightclub located in Alexandria, Louisiana. Lyle managed Club Retro, L.L.C. Lyle and Dar are Creole, and Club Retro's clientele was mixed-race. Before opening to the public in October 31, 2005, Club Retro passed various inspections and received permits to serve alcohol. As part of the inspection process, the state fire marshal set Club Retro's capacity at 680 persons. Lyle and Dar also confirmed that they could permit persons under the age of twenty-one but over the age of eighteen in the club, so long as they did not serve them alcohol. While deputy sheriff Slocum and assistant district attorney Thomas B. Searcy stated that the matter was a "grey" area, Searcy received confirmation from District Attorney James C. Downs that it was permissible.

On January 21 and 28, 2006, two Rapides Parish deputy sheriffs checked Club Retro to ensure that the doors were locked and closed at 2:00 a.m. On January 21, after Lyle and Dar protested, the officers left and promised to return with a copy of the applicable ordinance. A few days later, the Doublets visited the office of the Rapides Parish Sales and Use Tax Department where they confirmed that Club Retro could remain open after 2 a.m. on Sunday mornings

4

if they stopped selling and prevented patrons from consuming alcohol after 2 a.m. The following weekend, despite the Doublets' protestations, a deputy sheriff and his lieutenant ordered the club closed, and the Doublets complied with their order.

On the night of Saturday, February 4, 2006, and into the early hours of Sunday, February 5, 2006, Club Retro hosted a number of popular hip hop artists. Club Retro hired private security guards to search all patrons entering the club.[2] At approximately 12:15 a.m. Sunday morning, the club was crowded with approximately 500 patrons when persons waiting in line outside of the club crashed through the front door, pursued by forty Rapides Parish deputy sheriffs—some outfitted in full S.W.A.T. gear and black ski masks—who stormed Club Retro with shotguns, AR-15 assault rifles, and pistols drawn and pointed at both patrons and employees. At least one patron was injured in the chaos near the entranceway when a deputy sheriff "stomped" on her leg. Once inside the club, the officers forced many patrons to the ground at gunpoint, and the deputy sheriffs may have used tasers on club patrons.

The deputy sheriffs were acting pursuant to Operation Retro-Fit, a plan authorized by Sheriff Hilton; written, supervised, and executed by deputy sheriffs Slocum, LaCour, and Rauls; and supervised and executed by deputy sheriff Doyle. The sheriffs memorialized Operation Retro-Fit in a written plan that plaintiffs have attached to their complaint. The plan called for a

---

[2] A sign posted in the entranceway stated: "NO! Firearms, weapons, NO! loitering, NO! outside drinks, all persons subject to search!" Signs posted inside and near the bathrooms stated:

> Anyone caught with drugs will be escorted off the premises & possible arrest!!! There will be a $50.00 reward for anyone turning in information leading up to the arrest of anyone affiliated with the possession, selling, or buying of any illegal substances @ Club Retro, L.L.C.

5

warrantless raid on Club Retro using a S.W.A.T. team for the purposes of detecting the sale or possession of illegal narcotics, the sale of alcohol to minors, and fire code violations. The deputy sheriffs would be assisted by officers from the Metro Narcotics Unit, a K-9 Unit, the Louisiana Department of Revenue Office of Alcohol and Tobacco Control, and Louisiana Probation and Parole.

As soon as the raid began, the deputy sheriffs seized, assaulted, battered, and handcuffed Lyle and Dar, who were then transported to a warehouse holding facility and held for over six hours. Several hours later, Slocum had Judge John C. Davidson of the Ninth Judicial District Court for Rapides Parish sign arrest warrants against Lyle and Dar, based on affidavits sworn by LaCour. Although Judge Davidson initially refused because of the lack of probable cause on the night of the raid, he eventually relented and signed the warrants. The crime identified in both warrants was keeping Club Retro open past 2:00 a.m. on January 4, 2006, in violation of Louisiana Revised Statutes Annotated § 33:1236(6). The warrants additionally state that deputy sheriffs warned Lyle and Dar on January 27 and 28, 2006, that they were operating in violation of the law.[3]

Because of the scale and ferocity of the raid, many of Club Retro's employees thought that they were being robbed by armed gunmen. A deputy sheriff hurled himself across the bar into the bartending area and pushed bartender Krista Frost to the ground with a gun pointed at her head. Jonathan Frost, another bartender, was chased, thrown to the ground, and stepped on by a deputy sheriff after Jonathan held up his hands to surrender. The deputy

---

[3] January 4, 2006 was a Wednesday; January 27, 2006 was a Friday; and January 28, 2006 was a Saturday.

sheriff then pressed a 9mm pistol against Jonathan's neck as he searched him. Another deputy sheriff forced Christine Smith, a manager of Club Retro, to the ground at gunpoint and searched her. When masked officers reached the stage, they slammed the performers to the ground or the wall. Matt Mabou, Club Retro's disc jockey, looked up from his stereo equipment into the barrel of a gun. The deputy sheriff on the other end of the gun forced Mabou to turn the music off and the lights on and then searched him at gunpoint. The deputy sheriffs also rounded up Club Retro's other staff members at gunpoint and searched and detained them. The deputy sheriffs handcuffed some of the staff, and one of the staff members was hit on the head with a rifle butt.

The deputy sheriffs and other officers blocked all points of exit. They searched every patron and employee and required most patrons to walk by drug-sniffing dogs. As part of the search, some women were instructed to reach under their shirts, lift up their bras, and shake them so the deputy sheriffs could see if any illegal drugs would fall out. The deputy sheriffs separated patrons over twenty-one years of age from patrons between eighteen and twenty-one years of age. One-hundred-twenty-one patrons between the ages of eighteen and twenty-one were given citations for being in an alcohol-serving establishment. The parties dispute the lawfulness of those citations under Louisiana law. See infra n.24. At most seven patrons—approximately one percent of the total number of patrons—were arrested for drug-related crimes. The deputy sheriffs also announced to the patrons that they should never come back unless they wanted to risk another raid. They detained the patrons and employees between three and five hours and denied them access to the restrooms for a long period of time, during which some patrons urinated in empty bottles and one patron

7

fainted. Eventually, deputy sheriffs permitted some persons to use the restrooms if escorted by an official.

The deputy sheriffs proceeded to search the entire club, including the attic. Cash was confiscated from the registers. Mirrors, the cash registers, and the office areas were trashed. An armed officer kicked down the door to a separate, attached apartment that was protected by a security guard and not open to the public. Lyle and Erica resided in the apartment on nights when the club was open. Inside the apartment were plaintiff Olivia Doublet, Erica's minor daughter, and her two babysitters, one of whom was plaintiff Carley Smith, Christine's minor daughter. The officer pinned Carley against the wall and then forcibly removed the three girls from the room. The deputy sheriffs brought the girls into the bar area, placed them on stools, and photographed them as if they were bar patrons. Olivia had been sleeping and was in her pajamas at the time. Erica and Christine attempted to reach their daughters, but the officers denied them access. Slocum and another unnamed deputy sheriff announced that both girls would be taken by the Louisiana Department of Social Services Office of Community Services ("OCS"). After Erica explained that the girls had been removed from the private apartment and Slocum realized that OCS was not going to take the girls, he told an officer to arrest Erica for gun possession. Erica was cuffed and removed to the same holding facility as Lyle and Dar. The deputy sheriffs transported Christine, Olivia, Carley, and the other babysitter with Erica, and briefly detained them at the holding facility, but Christine was eventually allowed to leave with the three girls.

At the holding facility, Slocum and LaCour placed Erica in the room with Lyle and Dar, where all three were handcuffed to their chairs. Slocum and LaCour made threatening and obscene comments to her, including threats of

sexual assault. Earlier, during the preliminary stages of the raid, Slocum had looked at Erica, who is Caucasian, and said, "And you think you are white? You are not f---ing white." Slocum and LaCour also threatened Lyle and Dar. Tensions rose until Dar, an Iraq war veteran, commented, "After I have served a tour of duty in Iraq, I come home to this and experience terrorism in my own country." At that point, Slocum and Doyle ceased their threats, and tensions eased.

Because the deputy sheriffs' search of Club Retro produced handguns that Lyle and Dar kept in the club's office, Slocum and Doyle arrested Lyle, Dar, and Erica for possessing firearms in an alcohol retail establishment. In addition, the fire marshal estimated that, at the time of the raid, there were 822 people in Club Retro, so Slocum and Doyle charged Lyle and Dar with violating the fire marshal's order limiting Club Retro's capacity. The officers' count of cash in the cash registers used for the entry fees—a count that was captured on video—evidenced that there were not more than 500 people in the club when it was raided.

Doyle booked Lyle, Dar, and Erica at the Rapides Parish detention center. He charged Lyle and Dar with "GENERIC CHARGE-CHGE LATER," "FIREARM POSSESSION/BAR," and "FAILURE TO COMPLY FIRE MARSH." He booked Erica for "IMPROPER SUPERVIS. OF MINOR" and "FIREARM POSSESSION/BAR." Within a week, Lyle and Dar were arrested a second time and charged with allowing persons aged between eighteen and twenty-one years into Club Retro.

On the night of the raid, Club Retro advertised a performance by Paul Wall that was to take place the following Saturday, February 11, 2006. That Saturday night, a fire marshal and two Rapides Parish deputy sheriffs entered

Club Retro and stayed until the concert started. Two other deputy sheriffs parked their patrol cars conspicuously in Club Retro's parking lot for the duration of the evening. Many potential patrons who intended to attend the concert did not do so—some were seen driving into the parking lot where the patrol cars were parked and then departing. They did not want to experience a repeat of the events of February 5 and 6. Only sixty-seven patrons attended the concert.

About one-half mile down the road from Club Retro was GG's, a long-established, white-owned nightclub with a white clientele. GG's has never been raided in a manner similar to Operation Retro-Fit.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291 to review the district court's denials of qualified immunity. The denial of a motion to dismiss predicated on a defense of qualified immunity is a collateral order capable of immediate review. See Behrens v. Pelletier, 516 U.S. 299, 307 (1996) (holding that "an order rejecting the defense of qualified immunity at . . . the dismissal stage . . . is a 'final' judgment subject to immediate appeal"). Our jurisdiction, however, is severely curtailed: "we are restricted to determinations 'of question[s] of law' and 'legal issues,' and we do not consider 'the correctness of the plaintiff's version of the facts.'" Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 251–52 (5th Cir. 2005) (alteration in original) (quoting Mitchell v. Forsyth, 472 U.S. 511, 528 (1985)).

Within our limited jurisdiction, we review de novo defendants' invocations of qualified immunity. Id. at 252; Rios v. City of Del Rio, 444 F.3d 417, 420 (5th

Cir. 2006). We must accept all well-pleaded facts as true, draw all inferences in favor of the nonmoving party, and view all facts and inferences in the light most favorable to the nonmoving party. Atteberry, 430 F.3d at 252. To resist dismissal, plaintiffs must plead "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## B. Qualified Immunity

Plaintiffs' § 1983 claims seeking damages from defendants in their individual capacities are subject to the affirmative defense of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). To discharge this burden, "a plaintiff must satisfy a two-prong test." Atteberry, 430 F.3d at 253. "First, he must claim that the defendants committed a constitutional violation under current law." Id. (citing, e.g., Wilson v. Layne, 526 U.S. 603, 609 (1999)). "Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." Id.[4] "To be 'clearly established' for purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable

---

[4] In Pearson, 129 S. Ct. at 821, the Supreme Court relaxed the requirement, established in Saucier v. Katz, 533 U.S. 194 (2001), that we must decide if a constitutional violation occurred before we decide if the law was clearly established.

11

official would understand that what he is doing violates that right.'"  Kinney v. Weaver, 367 F.3d 337, 349–50 (5th Cir. 2004) (en banc) (alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "The central concept is that of 'fair warning':  The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"  Id. at 350 (quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002)).  We apply these standards to defendants' assertions of qualified immunity regarding their alleged (1) entry and search of Club Retro; (2) arrests of Lyle, Dar, and Erica; (3) searches and seizures of the individual plaintiffs; (4) infringements of Club Retro, L.L.C.'s, Lyle's, and Dar's free speech and association rights; and (5) discrimination.[5]

1.  Entry and Search of Club Retro

Based on the allegations of the amended complaint, we conclude that defendants are not entitled to qualified immunity for their entry and search of Club Retro because the unreasonable scope and manner of Operation Retro-Fit

---

[5] Although plaintiffs' allegations describe defendants' treatment of Club Retro's patrons, plaintiffs do not allege any claims on behalf of those patrons and readily acknowledge that they lack standing to bring such claims.  See Rakas v. Illinois, 439 U.S. 128, 133–34 (1978) ("'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)); San Jacinto Sav. & Loan v. Kacal, 928 F.2d 697, 704 (5th Cir. 1991) ("Because the record in this case is devoid of any evidence that [the plaintiff] was personally subjected to an illegal search or seizure, [the plaintiff] has no standing to assert the rights of third parties who may have been subjected to such searches or seizures while at [the plaintiff's store].").  Nonetheless, these allegations are relevant to certain matters that are before us, such as whether defendants' conduct exceeded the scope of a proper administrative search, see, e.g., Bruce v. Beary, 498 F.3d 1232, 1244 n.22 (11th Cir. 2007), and may be relevant to other issues not before us, such as causation of Club Retro's business losses, if any.

violated Club Retro, L.L.C.'s clearly established constitutional rights to be free from unreasonable searches and seizures.[6]

### a. Constitutional Violations

As alleged in the amended complaint, the entry and search of Club Retro violated Club Retro, L.L.C.'s Fourth Amendment right to operate its commercial property free from unreasonable searches and seizures. The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." The Supreme Court long ago "recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises." New York v. Burger, 482 U.S. 691, 699 (1987). Absent a warrant, consent, or other exigent circumstances, law enforcement officers act unreasonably and thus unconstitutionally when they enter a commercial property to conduct a search for contraband or evidence of a crime. Donovan v. Dewey, 452 U.S. 594, 598 n.6 (1981) (citing G.M. Leasing Corp., 429 U.S. at 352–359). Defendants do not argue that they acted pursuant to a warrant, probable cause, or exigent circumstances; instead, they base the reasonableness of their entry and search of Club Retro on two alternative theories: (1) that they had the same right to enter the club as any other patron, and (2) that they conducted a permissible administrative inspection. Neither theory renders Operation Retro-Fit a reasonable search, and precedent existing at the time of the searches shows that it was unreasonable.

---

[6] Lyle has brought claims both individually and as a manager on behalf of Club Retro, L.L.C., which has standing to maintain these claims. See G.M. Leasing Corp. v. United States, 429 U.S. 338, 352–59 (1977) (recognizing a corporation's Fourth Amendment rights).

### i. Public Establishments

We are not convinced by defendants' argument that they had the same right to enter the club as any other patron. Although defendants would have been free to accept the open public invitation that Club Retro gives to every patron, enter Club Retro, and observe the club and persons therein, defendants' entry and search of Club Retro and its owners, employees, and patrons far exceeded the scope of any public invitation. In Lewis v. United States, 385 U.S. 206 (1966), the Supreme Court held that "[a] government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant." Id. at 211. This is not an unbounded grant of authority, however: "this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials . . . ." Id. (citing Gouled v. United States, 255 U.S. 298 (1921)); accord State v. Lund, 409 So. 2d 569, 570 (La. 1982) (upholding an arrest where officers entered a club and only then "became inadvertent witnesses to criminal conduct").

The principal case relied on by defendants, State v. Dobard, 824 So. 2d 1127 (La. 2002), describes some boundaries and supports our conclusion. In Dobard, police officers entered a bar wearing plain clothes for the purpose of conducting a "vice check." Id. at 1129. After announcing their presence and approaching a patron, that patron acted suspiciously by visibly discarding an object in his possession and retreating from the officers. Id. The officers seized the patron and retrieved the object, which they later confirmed to be crack cocaine. Id. The Louisiana Supreme Court upheld the resulting arrest: the

14

officers had specific, articulable facts justifying the seizure of the defendant. Id. at 1133.

As permitted by Lewis, the officers' presence in the bar was constitutional: a police officer may accept a bar's invitation to the public and enter for "any reason or no reason." Dobard, 824 So. 2d at 1132. "[T]he officers were in a place they had a right to be and possessed the same right as any citizen to approach an individual and engage him in conversation." Id. The Louisiana court, however, narrowly limited the scope of this holding. It held that the officers "had no authority whatsoever to enter a bar and search its patrons for narcotics." Id. at 1131. "Had the officers been searching defendant's person for narcotics based solely on the fact it [sic] was conducting a so-called 'vice check,' then any contraband recovered would clearly be inadmissible in a subsequent prosecution." Id. It also noted that the officers had not "drawn their weapons, physically contacted defendant, ordered or signaled him to stop, or otherwise asserted any official authority over him when he panicked and discarded the contraband." Id. at 1132–33 (citations omitted). Thus, accepting a public invitation is permissible, but, absent cause, does not justify searches once inside the commercial establishment.

It is clear from these qualifications that defendants in this case could not reasonably rely on Dobard to justify the scope of Operation Retro-Fit. Taking plaintiffs' factual allegations as true, defendants did not enter Club Retro as would a typical patron; instead, they chose to project official authority by entering with weapons drawn in a S.W.A.T. team raid. They lacked any particularized suspicion or probable cause when they subsequently searched Club Retro, its attic, and the separate apartment and seized and searched all of

15

its patrons and employees. Thus, defendants' entry and search was not a reasonable acceptance of Club Retro's invitation to the public. Any other conclusion would be an invitation for S.W.A.T. team raids by law enforcement officers of any business that is open to the public and would severely undermine the Fourth Amendment protections afforded to owners of commercial premises.

## ii. Administrative Inspections

We are likewise not convinced by defendants' second argument that they conducted a permissible administrative inspection. Although Louisiana statutes and Rapides Parish ordinances authorizing administrative inspections may have provided justification for an entry and inspection of Club Retro, no such law permits the scope and manner of the raid that plaintiffs allege occurred here. It is true that a commercial property owner's Fourth Amendment rights are "particularly attenuated in commercial property employed in 'closely regulated' industries." Burger, 482 U.S. at 700. The liquor industry has been a closely regulated industry. Colonnade Catering Corp. v. United States, 397 U.S. 72, 77 (1970). The owner of a liquor establishment's attenuated Fourth Amendment interests "may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections." Donovan, 452 U.S. at 599; Colonnade Catering Corp., 397 U.S. at 77; see also Delaware v. Prouse, 440 U.S. 648, 654–55 (1979); Bruce, 498 F.3d at 1248 ("Under certain limited circumstances, the Constitution permits warrantless administrative searches. It never permits unreasonable ones.").

To avoid constitutional infirmity, a regulation providing for warrantless inspections of a pervasively regulated business must meet three criteria: (1) "there must be a 'substantial' government interest that informs the regulatory

16

scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" Burger, 482 U.S. at 702–03 (alterations in original, citations omitted). Only the third criterion is at issue in this case. To satisfy this third criterion, "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." Id. at 703. To put the owner on proper notice under the first function, "the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'" Id. (quoting Donovan, 452 U.S. at 600). To limit officer discretion under the second function, the regulation must carefully limit authorized inspections "'in time, place, and scope.'" Id. (quoting United States v. Biswell, 406 U.S. 311, 315 (1972)); see also United States v. Harris Methodist Ft. Worth, 970 F.2d 94, 101–02 (5th Cir. 1992).

Even under a valid inspection regime, the administrative search cannot be pretextual. See Burger, 482 U.S. at 724 ("In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations."); see also, e.g., City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000); Abel v. United States, 362 U.S. 217, 226 (1960); United States v. Johnson, 994 F.2d 740, 742 (10th Cir. 1993) (holding that an administrative

17

inspection is a sham if it is "a pretext solely to gather evidence of criminal activity." (emphasis added)).[7] And, in all cases, the Fourth Amendment's reasonableness requirement applies to government officials conducting administrative inspections of private commercial property. See Burger, 482 U.S. at 702; Donovan, 452 U.S. at 598.

Defendants propose a number of state statutes and local ordinances to justify their entry and search of Club Retro as an administrative inspection: alcohol control laws and ordinances, fire safety codes, and state firearm laws. Louisiana law authorizes sheriffs and other municipal officers to enforce alcohol control laws[8] with respect to retailers. See LA. REV. STAT. ANN. § 26:294.

---

[7] An officer's suspicions about criminal wrongdoing do not, however, render an administrative inspection pretextual. See United States v. Thomas, 973 F.2d 1152, 1155–56 (5th Cir. 1990) ("Administrative searches conducted pursuant to valid statutory schemes do not violate the Constitution simply because of the existence of a specific suspicion of wrongdoing."); accord Bruce, 498 F.3d at 1242 (expressing concern about "where to draw the line" between administrative inspections and pretextual searches, but concluding that the administrative search was not rendered invalid based on some prior suspicion of wrongdoing).

[8] Substantively, Louisiana law prohibits the sale of alcohol to persons under the age of twenty-one, see LA. REV. STAT. ANN. § 26:286(A)(1), and prohibits anyone from permitting a person under the age of eighteen from entering any place where alcoholic beverages are the principal commodities sold, see id. § 26:286(A)(3)(a); see also id. § 14:92 (applying same prohibition in context of the crime of contributing to the delinquency of juveniles under the age of seventeen). Louisiana also permits local municipalities to "adopt ordinances regulating or prohibiting the opening of certain businesses and/or the sale of certain stock or articles of merchandise on Sunday, if approved by the voters at an election," id. § 51:191, and to "regulate but not prohibit, except by referendum vote . . ., the business of wholesaling, retailing, and dealing in alcoholic beverages," id. § 26:493. Rapides Parish accordingly ordered closed all bars in the Parish from 2:00 a.m. until 12:00 midnight on Sundays, see RAPIDES PARISH ORDINANCE 4-3(a)(3)(a), and raised the age at which a person can enter a bar from eighteen to twenty-one, see RAPIDES PARISH ORDINANCE 4-25(3). Neither ordinance was submitted to voters at an election or approved by referendum vote, and the parties dispute the legality of these municipal ordinances in light of Louisiana's statutory delegation of authority.

Louisiana statutes and Rapides Parish Ordinances also provide for administrative inspections:

> [M]unicipal authorities, sheriffs, and other law enforcing officers shall have periodic investigations made of the business of all permittees within their respective jurisdictions. If any violation [of the liquor laws] is observed, such authorities may give the permittee a written warning. If the permittee has been previously warned or if the violation is of a sufficiently serious nature, they shall file an affidavit with the commissioner, setting forth the facts and circumstances of the violation. Thereupon, the commissioner shall summon the permittee to appear and show cause why his permit should not be suspended or revoked.

LA. REV. STAT. ANN. § 26:93(B); see also RAPIDES PARISH ORDINANCE 4-27.[9] In addition, separate laws and ordinances permit searches of storage areas (subject to strict warrant requirements for private residences and nonpublic areas) and the inspection of a liquor licensee's books. LA. REV. STAT. ANN. §§ 26:370, 26:371; RAPIDES PARISH ORDINANCE 4-28.[10]

---

[9] Rapides Parish Ordinance 4-27 provides:
The sheriff of Rapides Parish, Louisiana, is hereby given the power and authority to search and examine any place in which he believes a violation of [the local liquor laws] is being committed; provided, that no house, room or apartment used as, or which apparently is, a bona fide residence shall be subject to invasion and search except by an officer designated in a search warrant issued by a competent court having the power of a committing magistrate.

[10] Louisiana Revised Statutes Annotated § 26:371, which Rapides Parish Ordinance 4-28 mirrors, provides, in part, that:
A. The secretary may search and examine pursuant to the provisions of this Section, all places of storage except private residences, which may be searched only in the manner provided by law. . . .
B. No place, other than such as is open to the public, shall be invaded and searched for alcoholic beverages except by an officer named in a search warrant issued by a competent court having the power of a committing magistrate upon the filing in the court of an affidavit reciting that affiant has reasons to believe and believes that the named place is being utilized as a site for the violation of the provisions of the [liquor laws] together with such additional evidence as the

Louisiana law similarly authorizes local law enforcement officials to enforce the fire safety codes and the lawful orders of the state fire marshals. LA. REV. STAT. ANN. § 40:1591. Specifically, § 40:1575[11] permits the fire marshal to inspect structures for fire code violations; when an inspector uncovers a

court may require to make out a prima facie case. No house, room, or apartment used as, or which apparently is, a bona fide residence is subject to invasion and search, except by an officer designated in a search warrant issued by a competent court having the powers of a committing magistrate, upon the filing in the court of an affidavit by two reliable persons reciting that they have reasons to believe and do believe that the place of residence is being used as a cloak or cover for a violation of the provisions of [the liquor laws] and setting forth the specific violation being committed therein, together with such additional corroborating evidence as the court may require to establish the probable existence of the alleged violation.

Louisiana Revised Statutes Annotated § 26:370 adds:

The secretary may examine, at all reasonable hours, the books, records, and other documents of all . . . permittees . . . in this state. If a . . . permittee . . . refuses to permit this examination by the secretary, the secretary may proceed by rule . . . in any court in the parish where the refusal occurred, requiring the person refusing to show cause why the secretary should not be permitted to examine its books, records and documents. Refusal by a . . . permittee . . . to allow the secretary access to its books, records, and documents shall render any alcoholic beverages within this state owned by or in the possession of or in the control of such person or his employer or agent subject to seizure, forfeiture, and sale as provided in [the liquor laws].

[11] In relevant part, § 40:1575 provides:

A. . . . [U]pon his own initiative when he thinks necessary, the fire marshal or any of his authorized representatives may inspect any structure . . . within the state except the interiors of private and one- or two-family dwellings.

B. Whenever the inspecting officer finds any such structure . . . , which, for any cause, is especially . . . dangerous to life . . ., he shall order . . . the condition of the premises remedied . . . . The occupant of the structure . . . shall not permit it to be used until the fire marshal certifies that the hazardous conditions have been eliminated.

C. Among the causes which render a structure . . . especially liable to fire or dangerous to life are the following:

. . .

(4) Lack of adequate means of ingress and egress.

(5) Lack of adequate, unrestricted passageways to the entrances and exits.

violation, he orders the violation remedied pursuant to service and summons procedures, see id. §§ 40:1576, 40:1591. The owner of the property may appeal any such order within three days. See id. § 40:1577.

Finally, Louisiana firearm laws outlaw patrons, but not owners or employees, from possessing firearms in bars, see LA. REV. STAT. ANN. § 14:95.5, and thus permit limited, presumed-consent, searches for guns of individuals who enter alcohol retailers, see LA. REV. STAT. ANN. § 14:95.4(A). Section 14:95.4(A) establishes:

> Any person entering an alcoholic beverage outlet as defined herein, by the fact of such entering, shall be deemed to have consented to a reasonable search of his person for any firearm by a law enforcement officer or other person vested with police power, without the necessity of a warrant.

The owner of a bar must post a sign near the entranceway stating that entry constitutes consent to such a search. Id. § 14:95.4(E).

These alcohol control, fire safety, and firearm laws do not authorize the entry and search alleged to have occurred during Operation Retro-Fit. Instead, these statutes and ordinances authorize and put property owners on notice of periodic inspections for compliance with the fire safety and alcohol control laws and patrons on notice of reasonable firearm searches. The administrative inspection regimes limit law enforcement authority to periodic inspections of public places and limit the inspectors' authority through defined procedures, such as various warning, petition, affidavit, summons, and warrant provisions. See, e.g., id. §§ 26:93, 26:371(B). The inspection statutes and ordinances do not grant law enforcement officers unfettered discretion to conduct searches of business premises through any means of their choosing and do not provide notice to bar owners that their business, employees, and patrons are subject to armed

S.W.A.T. team raids, physical assault, threats at gunpoint, and prolonged detention.[12] Defendants conducted a S.W.A.T. team raid, blocked the exits, and engaged in a massive show of force. They physically assaulted plaintiffs, who had weapons pointed at their faces by men in ski masks and were detained for many hours without being permitted access to the restrooms. As alleged in the amended complaint, the nature of the raid's execution led employees to believe that they were being robbed by armed gunmen and not that law enforcement authorities were inspecting Club Retro for compliance with state and local ordinances. Defendants' search of Club Retro extended into the attic and a private apartment located in the building. A deputy sheriff broke down the door to that separate apartment, and the children in the room were removed to the bar to be photographed. Property in the bar was destroyed. In contrast, on at least two prior occasions, deputy sheriffs were able to inspect Club Retro without drawing their weapons and, at those times, press Lyle and Dar to close the club at 2 a.m. Those prior inspections belie the need for a S.W.A.T. team raid to effectuate the inspection statutes and ordinances.

During oral argument, defendants did not attempt to justify the scope and manner of the raids as reasonable, admitting instead that reasonableness is a fact-based question for which they must defer to the allegations of the amended complaint at this stage of the litigation. Administrative inspections, by their

---

[12] If we were to agree with defendants that the inspection statutes and ordinances permit the actions undertaken here, we would also be forced to consider whether they are a constitutionally adequate substitute for a warrant because they would not provide similar protections from law enforcement officers' unlimited discretion. See Burger, 482 U.S. at 702–03; Donovan, 452 U.S. at 600; Marshall v. Barlow's, Inc., 436 U.S. 307, 323 (1978); Colonnade Catering Corp., 397 U.S. at 77. We, however, do not credit defendants' assertion because these administrative inspection statutes and ordinances do not grant officers authority to conduct searches of the scope alleged here.

very nature, require more limited, less intrusive conduct than is alleged to have occurred here. We thus conclude that defendants' S.W.A.T. team entries and extensive searches, as described in the amended complaint, unreasonably exceeded the scope of Louisiana and Rapides Parish administrative inspection laws.[13] Any other conclusion would allow the administrative inspection exception to swallow the Fourth Amendment's warrant requirement for searches of private property.

Our conclusion is supported by case law holding that an administrative inspection regime cannot support armed raids, broad searches, and extended detentions. In Swint v. City of Wadley, 51 F.3d 988 (11th Cir. 1995), the Eleventh Circuit relied on existing Supreme Court precedent to reject qualified immunity as a defense for officers who conducted two raids of a nightclub that were comparable in relevant respects to the raid here. There, a S.W.A.T. team of thirty to forty officers, wearing ski masks, swarmed a club after receiving a signal from an undercover officer who had probable cause to arrest one patron for an illegal drug transaction. Id. at 993. The officers pointed their weapons at many of the club's patrons and employees; prohibited the owners, employees, and patrons from moving or leaving; searched all individuals; refused patrons' and employees' requests to use the restrooms; searched the club, its cash registers, and door receipts; and maintained control of the premises and persons for between one and one and one-half hours. Id. The court concluded that the officers could point to "no authority that even suggests that the search and seizure of one suspect in a public place can be bootstrapped into probable cause

---

[13] We need not and do not decide whether defendants' administrative inspection justification was a pretext for a search for evidence of criminal wrongdoing.

for a broad-based search of the business establishment and its patrons." Id. at 997 (citing Ybarra v. Illinois, 444 U.S. 85 (1979)). It also held that the raids were not administrative searches:

> The facts viewed favorably to plaintiffs simply will not support an administrative search theory. Administrative inspections conducted on the [c]lub and its predecessor establishment both before and after the two raids at issue in this case were accomplished without the massive show of force and excessive intrusion witnessed in the [two] raids. Moreover, during the two raids the officers did not simply search for violations of the liquor laws by the establishment; instead, a number of people were searched for evidence of their violation of drug laws, searches to which they did not consent as part of any regulatory scheme.

Id. at 998.[14]

---

[14] In Crosby v. Paulk, 187 F.3d 1339 (11th Cir. 1999), the Eleventh Circuit upheld a less intrusive raid as a constitutional exercise of an administrative inspection where "no . . . officer involved in securing the nightclubs and conducting the investigation drew a weapon or threatened the arrestees or any patron." Id. at 1343. The officers limited their search to verifying patrons' ages, determining if there were after-hours alcohol sales, and ensuring that the beer taps were properly labeled. Id. The court distinguished this more limited search from the search in Swint based on, inter alia, the use of a S.W.A.T. team, drawn weapons, and more extensive searches in the latter case. Id. at 1349 n.14.

More recently, in Bruce, 498 F.3d at 1236, the Eleventh Circuit held unconstitutional a warrantless inspection of an auto body repair shop and salvage yard. Officers in S.W.A.T. team gear surrounded the yard, blocked all exits, entered the premises with pistols and shotguns drawn, and ordered the employees to line up along a fence. Id. One employee "felt something touch his back and turned around to find an officer pointing a shotgun at him." Id. The officers patted down and searched the employees, a desk, and a locked briefcase. Id. They arrested the owner on charges of possession of loose vehicle identification number plates and operating a "chop shop" in violation of state law and searched the entire premises. Id. at 1237. The search lasted over eight hours. The court, noting that prior administrative inspections had not required the use of a S.W.A.T. team, held that the scope and manner of the searches was unreasonable. Id. at 1243–44. It concluded that:

> [T]he searches in Swint and as claimed in this case deserve to be called what they were—criminal raids. The inspection of books and records, of automobile titles and VIN numbers does not require exits to be blocked, an automatic shotgun to be stuck into an employee's back, employees to be lined up along a fence and patted down and deprived of their identification. None of this conduct

In an unpublished opinion, the Sixth Circuit reached a similar conclusion in Russo v. Massullo, No. 90-3240, 1991 WL 27420 (6th Cir. Nov. 5, 1991). In Russo, the officers conducted a warrantless, armed raid of a restaurant and lounge to serve notices of noncompliance with liquor control laws and to seize two allegedly illegal video-poker gambling machines. The officers entered the lounge with shotguns and pistols drawn, pointed them at various persons, and ordered everyone to raise their hands. They then conducted pat-down searches of everyone in the lounge, after which patrons were allowed to leave. Id. at *1. The lounge owner and an employee were detained and forbidden from using the restroom without the accompaniment of an officer. Id. The entire incident lasted approximately two hours. Id. The court concluded that "[a]lthough we agree with the defendants that they had a right to conduct an administrative inspection based on the presumptive constitutionality of the statute, we do not agree that the statute was enough to clothe in qualified immunity those actions which went beyond those specifically authorized by the statute." Id. at *4.

Based on the facts as alleged by plaintiffs in this case, Operation Retro-Fit was broader in scope and more extreme in manner than the administrative inspection laws permit. Swint, Bruce, and Russo all concluded that similar, arguably less extreme, searches were unconstitutional under existing Supreme Court precedent. The search of Club Retro deserves to be called what it was—a raid to discover evidence of criminal wrongdoing. Such raids are "not the sort of conduct that was approved by the Supreme Court in Burger." Bruce, 498 F.3d

---

is either routine or administrative. It is the conduct of officers conducting a raid.

Id. at 1245. The present case is clearly more closely situated to Swint and Bruce than Crosby.

25

at 1245. Operation Retro-Fit was therefore a violation of Club Retro, L.L.C.'s Fourth Amendment rights.

### b. Objectively Reasonable Conduct Under Clearly Established Law

The Fourth Amendment rights at issue in this case were clearly established at the time of defendants' entry and search of Club Retro such that a reasonable person would have known that Operation Retro-Fit violated those rights. The Supreme Court long ago recognized that the Fourth Amendment protects the owner of a commercial establishment, even a heavily regulated one, "from unreasonable intrusions onto his property by agents of the government." Donovan, 452 U.S. at 599 (emphasis in original). This court has stood by that principle for decades. See, e.g., Harris Methodist Ft. Worth, 970 F.2d at 100–02. Existing Supreme Court precedent guided other courts of appeals to conclude that violations of clearly established rights had occurred in Swint and Russo, long before the events in this case. No reasonable deputy sheriff in defendants' positions could believe that the law permitting an official to accept a public invitation to enter a commercial establishment as would a typical citizen justifies a S.W.A.T. team assault by forty armed officers with weapons drawn and a full search without a warrant that is supported by probable cause. Similarly, no reasonable deputy sheriff in defendants' positions could have concluded that such a raid—in which they, e.g., threatened individuals with weapons, threw employees to the ground, searched the attic and trashed the cash registers, broke down the door to a closed apartment, and blocked the exists to a club they believed to be overcrowded[15]—was a lawful, warrantless

---

[15] To the extent the fire safety code is designed to mitigate the threat of overcrowding, locking patrons inside an overcrowded building for multiple hours would appear to exacerbate,

administrative search to check for underage alcohol consumption or fire code violations. See Bruce, 498 F.3d at 1249–50 ("Both Burger and Edmond, decided before the instant search, made clear that administrative searches are governed by the Fourth Amendment's requirement for reasonableness."); Showers v. Spangler, 182 F.3d 165, 173 (3d Cir. 1999) (holding that the officer's planning and execution of an exhaustive search of plaintiff's business "had all the hallmarks of a purely criminal investigation" that violated "the law barring random and extensive administrative searches [that] had been clearly established since at least the Burger case in 1987"); Swint, 51 F.3d at 998 ("No reasonable officer in the defendants' position could have believed that these were lawful, warrantless administrative searches."); Russo, 1991 WL 27420, at *4 ("[A]t the time of the search, it was clearly established that even where a legislative body provides for an administrative inspection of a liquor establishment without consent, but has 'made no rules governing the procedure that inspectors must follow, the Fourth Amendment and its restrictive rules apply.'" (quoting Colonnade Catering Corp., 397 U.S. at 77)). Thus, we affirm the district court's order denying qualified immunity for defendants' planning, approval, and execution of Operation Retro-Fit as it respects the entry into and search of Club Retro.

2. Arrests

Slocum and Doyle are not entitled to qualified immunity for their arrests of Lyle, Dar, and Erica.[16] As alleged in the amended complaint, the arrests were

---

not mitigate, the risks that the administrative inspection regime is designed to ameliorate, further coloring defendants' actions as unreasonable.

[16] On appeal, the parties have not raised or briefed plaintiffs' state-law false arrest claims; therefore, we rule only regarding false arrest under federal law.

not supported by probable cause based on the facts and circumstances known to Slocum and Doyle at the time they made the arrests and therefore violated Lyle's, Dar's, and Erica's clearly established Fourth Amendment rights.[17]

### a. Constitutional Violations

The constitutional claim of false arrest requires a showing of no probable cause.[18] Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001). "The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Piazza v. Mayne, 217 F.3d 239, 245–46 (5th Cir. 2000) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). The facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest. Sibron v. New York, 392 U.S. 40, 62–63 (1968); Henry v. United States, 361 U.S. 98, 102 (1959); Johnson v. United States, 333 U.S. 10, 16 (1948); Carroll v. United States, 267 U.S. 132, 161–62 (1925). The facts must be particularized to the arrestee. Ybarra, 444 U.S. at 91. We apply an objective

---

[17] During oral argument, defendants wisely conceded that the arrests of Lyle, Dar, and Erica on gun possession charges violated clearly established constitutional rights of which a reasonable person would have known. We therefore focus only on defendants' other asserted bases for arresting Lyle, Dar, and Erica. To the extent any other individual plaintiffs were subject to de facto arrest during Operation Retro-Fit, we consider the legality of those arrests in our review of their claims of unlawful search and seizure.

[18] A false arrest claim also requires a showing that any resulting "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck v. Humphrey, 512 U.S. 477, 486–87 (1994). The amended complaint does not allege that Lyle, Dar, or Erica were convicted of or sentenced for any crimes, and defendants have not raised Heck as a bar to the present false arrest claims.

standard, which means that we will find that probable cause existed if the officer was aware of facts justifying a reasonable belief that an offense was being committed, whether or not the officer charged the arrestee with that specific offense.  See Devenpeck v. Alford, 543 U.S. 146, 153–54 (2004).

Defendants assert that Slocum and Doyle had probable cause at the time of arrest to believe that Lyle and Dar failed to comply with an order of the fire marshal, in violation of Louisiana Revised Statutes Annotated § 40:1621; permitted persons between the ages of eighteen and twenty-one years of age into Club Retro, in violation of Rapides Parish Ordinance 4-25(3); kept Club Retro open after 2 a.m., in violation of Rapides Parish Ordinance 4-3(a)(3)(a); and permitted minors younger than the age of eighteen to enter Club Retro, in violation of Louisiana Revised Statutes Annotated §§ 26:90(A)(3)(a), 26:286(A)(3)(a).

We conclude that the facts as alleged in the amended complaint do not permit a conclusion that defendants had probable cause to arrest Lyle and Dar under these laws at the time of the arrests.  Although the parties primarily dispute the validity and applicability of Rapides Parish's ordinances, the allegations of the amended complaint clearly establish that Slocum and Doyle did not possess knowledge of material facts at the times of the arrests. According to the amended complaint, Lyle and Dar were seized and removed from Club Retro "as soon as the military attack maneuver began."  Although we leave the final resolution of the factual issues for later stages of litigation, Anderson v. Creighton, 483 U.S. 635, 641 (1987) (holding that "the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of information possessed by the searching officials"), there are no

allegations in the amended complaint that defendants plausibly knew at the time of the arrests (1) that the fire marshal estimated the number of patrons inside Club Retro to exceed the prior capacity order; (2) that some patrons were between eighteen and twenty-one years of age;[19] or (3) that minor children were in a separate, private apartment. Similarly, the amended complaint expressly states that Judge Davidson did not sign the warrants for Lyle's and Dar's arrests for operating Club Retro after 2 a.m. on January 4, 2006, until hours after their arrests.[20]

---

[19] Defendants assert that Slocum had probable cause because Lyle and Dar earlier notified Slocum that they would permit persons between eighteen and twenty-one years of age into Club Retro. This argument is unfounded. The facts of the amended complaint allege only that Lyle and Dar asked him whether or not the law permits them to do so. He allegedly responded that the law was a "grey area" and directed them to the district attorney's office. The district attorney then confirmed that the law allowed them to permit persons between eighteen and twenty-one years of age to enter Club Retro so long as Club Retro did not serve those persons alcohol. Thus, based on the amended complaint's allegations, Slocum did not have probable cause to believe that Lyle and Dar were permitting persons between eighteen and twenty-one years of age into Club Retro, absent the contemporaneous knowledge that the district attorney's office had so advised them.

[20] Alternatively, based on the facts alleged in the amended complaint, plaintiffs have shown that the warrants cannot support the arrests. The amended complaint alleges that, although the warrants were sworn by LaCour, they were procured with Slocum's involvement. "While a valid arrest warrant would normally insulate officers against a claim for false arrest, in a case such as the one before us where the officers charged with false arrest were responsible for securing the warrant, we are required to test the validity of that warrant, applying the usual standards." Mendenhall v. Riser, 213 F.3d 226, 232 (5th Cir. 2000). Rapides Parish Ordinance 4-3(a)(3)(a) prohibits an alcohol retailer, such as Club Retro, from remaining open after 2 a.m. on Sunday mornings. These warrants, however, cannot justify the arrests of Lyle and Dar because, inter alia, January 4, 2006, was a Wednesday, not a Sunday. Thus, the warrants do not authorize an arrest based on facts constituting probable cause to believe a violation of ordinance 4-3(a)(3)(a) had occurred. The same fact precludes an argument that Slocum or Doyle had probable cause independently from the flawed warrants. Because defendants have provided us with no argument that the warrants were valid, because they were not signed until hours after Lyle's and Dar's arrest, and because probable cause was completely lacking in any case, the warrants cannot support the arrests.

Regarding Slocum's and Doyle's arrest of Erica, defendants assert that they had probable cause to charge her with improper supervision of a minor because she permitted her minor daughter Olivia to enter Club Retro in violation of Louisiana Revised Statutes Annotated §§ 14:92(A)(3), 26:90(A)(3)(a), 26:286(A)(3)(a), and Rapides Parish Ordinance 4-23(3).[21] Although the laws identified by defendants prohibit a person from permitting a minor to enter an establishment that primarily serves alcohol, both Louisiana law and Rapides Parish ordinances clearly distinguish between areas in an alcohol-serving establishment and separate, private apartments used as residences that are not open to the public, see LA. REV. STAT. ANN. § 26:371(B); RAPIDES PARISH ORDINANCE 4-27. Here, the allegations of the amended complaint show that a deputy sheriff broke down the door to the separate, private apartment that was inaccessible to the public and used as a residence wherein Olivia and two other minors were staying.[22] Olivia was asleep in her pajamas at the time. Officers removed all three minors from the separate apartment and seated them at the bar in order to photograph them. Erica told Slocum and other officials that the girls had been removed from a separate apartment that Lyle and she used as a residence. Only then was she arrested. Based on these allegations, we accept as fact that Olivia was in a separate apartment, not in Club Retro, prior to the raid and that the deputy sheriffs were aware of that fact. Vested with that

---

[21] Although the facts of the amended complaint clearly allege that a deputy sheriff did not discover Olivia, Carley, and the third minor until well after Lyle and Dar were arrested, our holding that Slocum and Doyle lacked probable cause to arrest Erica also applies with equal force to Lyle and Dar.

[22] Thus, defendants' reliance on State v. Scallan, 10 So. 2d 885 (1942), is misplaced. In Scallan, the defendant was charged with allowing his daughter to enter a night club, not keeping her in a separate apartment. Id. at 886–87.

knowledge, a reasonable officer in Slocum's and Doyle's positions would not have believed that the circumstances provided probable cause to arrest Erica for committing the offense of permitting a minor to enter the establishment of an alcohol retailer. Erica's arrest was therefore unconstitutional.

We conclude that, on the facts alleged in the amended complaint, Slocum's and Doyle's arrests of Lyle, Dar, and Erica violated their constitutional rights to be free from arrest lacking probable cause.[23]

> b. Objectively Reasonable Conduct Under Clearly Established Law

The Fourth Amendment right to be free from false arrest—arrest without probable cause—was clearly established at the time of Lyle's, Dar's, and Erica's arrests. See, e.g., Gerstein v. Pugh, 420 U.S. 103, 111–12 (1975); Mendenhall, 213 F.3d at 230; Thomas v. Kippermann, 846 F.2d 1009, 1011 (5th Cir. 1988). Nonetheless, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Mendenhall,

---

[23] Plaintiffs also argue that, even if Slocum and Doyle had probable cause to arrest Lyle, Dar, and Erica, defendants nonetheless effectuated their arrests in such ways as to render them unreasonable, citing Whren v. United States, 517 U.S. 806, 818 (1996). While in most cases the existence of probable cause removes any doubt about the reasonableness of the seizure because the law enforcement interest significantly outweighs the person's interest in being free from governmental intrusion, see id.; Moore, 128 S. Ct. at 1605 (holding that "an arrest based on probable cause serves interests that have long been seen as sufficient to justify the seizure"), under certain extraordinary circumstances—typically involving physical harm or invasion of privacy—an arrest based on probable cause may be unreasonable under the Fourth Amendment's balancing test, see Whren, 517 U.S. at 818; Tennessee v. Garner, 471 U.S. 1, 7–8 (1985). Plaintiffs assert that defendants' extremely physical and threatening conduct in conducting the raid, collecting the purported evidence of wrong-doing, and seizing Lyle, Dar, and Erica render the arrests extraordinary and unreasonable. Because we conclude that, on the facts alleged in the amended complaint, no probable cause existed for Lyle's, Dar's, and Erica's arrests, we need not and do not reach this issue. The district court is free to consider it if factual developments at subsequent stages of litigation lead to the conclusion that probable cause existed at the times of the arrests.

213 F.3d at 230 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)) (other quotation marks and citations omitted). Thus, plaintiffs must allege facts permitting an inference that defendants lacked arguable (that is, reasonable but mistaken) probable cause for the arrests. See Babb v. Dorman, 33 F.3d 472, 478 (5th Cir. 1994); see also Tarver v. City of Edna, 410 F.3d 745, 750 (5th Cir. 2005).

Plaintiffs have alleged facts showing that Slocum and Doyle lacked arguable probable cause to arrest Lyle, Dar, and Erica. For Lyle and Dar, Slocum's and Doyle's knowledge of the factual circumstances that they argue gave rise to probable cause did not emerge until after they effectuated the arrests. Yet, it is and was at that time axiomatic that the officers must know the factual predicate for probable cause prior to arrest. See, e.g., Sibron, 392 U.S. at 62–63; Henry, 361 U.S. at 102. Based on the facts of the amended complaint, Slocum and Doyle lacked arguable probable cause to arrest anyone at the outset of the raid.[24]

---

[24] Defendants argue that, as an alternative basis for granting qualified immunity, Slocum and Doyle had arguable probable cause to arrest Lyle and Dar for permitting persons between eighteen and twenty-one years of age into Club Retro, in violation of Rapides Parish Ordinance 4-25(3). Plaintiffs argue that Rapides Parish's promulgation of this ordinance violated Louisiana Revised Statutes Annotated § 26:493. Section 26:493 authorizes a parish to "regulate but not prohibit, except by referendum vote . . . the business of . . . retailing . . . alcoholic beverages" but no "more than is necessary for the protection of the public health, morals, safety, and peace." The parties contest whether the Rapides Parish Ordinance 4-25(3) prohibits or regulates and thus whether a referendum vote was necessary for its lawful promulgation. Defendants alternatively assert that, even if it was unlawfully promulgated, Slocum and Doyle did not act objectively unreasonably when making an arrest pursuant to an ordinance that was "on the books" and not clearly established to be unlawful in February 2006. Plaintiffs allege that they relied on official interpretations by Rapides Parish officials to ensure that they were acting in accordance with Rapides Parish Ordinance 4-25(3), that they asked Slocum about the legality of such a course of action, and that Slocum directed them to the officials; thus, Slocum's actions were unreasonable. Whether or not the arrests were objectively reasonable on this ground—that is, whether Slocum and Doyle acted reasonably but mistakenly in believing that this ordinance provided them with probable cause—we need not decide: having already decided that they lacked probable cause to arrest for this violation

For Erica, Louisiana law at the time of Erica's arrest clearly recognized the separate nature of an apartment used, or apparently used, as a private residence and forbade an officer from entering such an apartment absent a properly obtained warrant in the context of a search for violations of alcohol control laws (let alone when not reasonably acting pursuant to such an inspection program). See LA. REV. STAT. ANN. § 26:371(B). According to the amended complaint, Olivia and the other minors were in a separate, private apartment, and an officer had to break down the door in order to gain access. While further factual development is warranted, we cannot now conclude that Erica's arrest was based on arguable probable cause.

Overall, we affirm the district court's order denying qualified immunity to Slocum and Doyle for Erica's arrest and affirm on different grounds the district

---

because the factual predicate—their knowledge of the age of the patrons—did not arise until after the arrests, this issue is not yet ripe. If factual developments at subsequent stages of litigation lead to the conclusion that probable cause existed at the time of the arrests to believe that a violation of ordinance 4-25(3) had occurred, the district court should consider how a reasonable officer would have proceeded under the totality of the circumstances known to Slocum and Doyle at that time. Cf. Pearson, 129 S. Ct. at 819 (identifying ambiguous state statutes or uncertain assumptions about state law as factors bearing on whether to determine if an official acted objectively unreasonably in light of clearly established law before determining whether a violation of constitutional rights occurred).

Plaintiffs similarly contest the validity of Rapides Parish Ordinance 4-3(a)(3)(a) (the 2 a.m. Sunday closure ordinance) in light of Louisiana Revised Statutes Annotated § 51:191, which probably requires that ordinance to have been approved by the voters in an election. See City of Zwolle v. Polk, 643 So. 2d 201, 202 (La. Ct. App. 1994) (holding that § 51:191 mandates that "a local government may prohibit Sunday sales only if the ordinance is approved by the voters in an election" (emphasis in original)); see also Bebop's Ice House, Inc. v. City of Sulphur, 774 So. 2d 369, 372–73 (La. Ct. App. 2000). Even if it was a valid statute, because defendants assert that plaintiffs operated Club Retro after 2 a.m. on January 4, 2006, a Wednesday, it is not a statute on which to base a finding of arguable probable cause on the facts of this case.

court's order denying qualified immunity to Slocum and Doyle for Lyle's and Dar's arrests.[25]

### 3. Searches and Seizures of Individual Plaintiffs

Slocum, Rauls, LaCour, and Doyle are not entitled to qualified immunity for their searches and seizures of Lyle, Dar, Erica, Olivia, Christine, Carley, Mabou, and Jonathan. As alleged, the searches and seizures of those plaintiffs violated their clearly established Fourth Amendment rights.[26]

### a. Constitutional Violations

A search and seizure of a person must be based on probable cause particularized with respect to that person unless a constitutionally adequate substitute for probable cause exists. See Ybarra, 444 U.S. at 91–94. Defendants argue that the searches and seizures of the individual plaintiffs were (1) reasonable weapons searches based on the consent presumed under Louisiana statutory law when the plaintiffs entered Club Retro, see LA. REV. STAT. ANN. § 14:95.4(A); (2) stops and frisks based on reasonable suspicion that plaintiffs were engaged in unlawful activities and armed and dangerous, as authorized by Terry v. Ohio, 392 U.S. 1 (1968); and (3) reasonable searches incident to arrest—whether formal or de facto—based on probable cause.[27] Plaintiffs have

---

[25] We will not consider defendants' other asserted bases of probable cause to arrest each individual plaintiff because defendants have not identified facts contained in the amended complaint that are particularized to each plaintiff. See Ybarra, 444 U.S. at 91.

[26] Defendants make no argument regarding the conduct directed toward Olivia and Carley other than to contest whether they were in a separate apartment or in Club Retro. Such factual disputes are not properly before us at this stage of litigation. See Behrens, 516 U.S. 312–13 (citing Johnson v. Jones, 515 U.S. 304, 313–318 (1995)).

[27] Defendants first argue that plaintiffs had no reasonable expectation of privacy once they chose to open, operate, or work at Club Retro. This argument warrants little discussion. The presence in public, even in a highly regulated commercial establishment, does not lessen

alleged facts showing that defendants' searches and seizures of Lyle, Dar, Erica, Olivia, Christine, Carley, Mabou, and Jonathan far exceeded the scope of permissible statutory searches for weapons; were not based on individualized suspicions as required by Terry; and were not searches incident to arrests based on probable cause.

### i. Statutory Weapons Searches

Based on the facts alleged in the amended complaint, the searches and seizures of plaintiffs during Operation Retro-Fit were not reasonable weapons searches. Louisiana Revised Statutes Annotated § 14:95.4(A) provides that "[a]ny person entering an alcoholic beverage outlet . . ., by the fact of such entering, shall be deemed to have consented to a reasonable search of his person for any firearm by a law enforcement officer . . . without the necessity of a warrant." Two factual allegations dispel any contention that this statute authorized the searches in this case. First, the searches conducted were not limited to searches for weapons. The presence of drug sniffing dogs and the assistance of narcotics and parole officers suggests that the searches were for evidence of crimes, not only firearms. Second, the searches were not reasonable—a statutory requirement for the presumed-consent searches. The deputy sheriffs pointed guns at, physically assaulted, and threatened plaintiffs. Jonathan was pushed to the ground at gunpoint and searched. Mabou was searched at gunpoint. Christine was forced to the ground at gunpoint and searched. Carley, a minor staying in the separate apartment, was shoved against the wall. Christine, Carley, Erica, and Olivia were all removed from the

---

an individual's right to be free from unreasonable searches and seizures by governmental officials. See Ybarra, 444 U.S. at 91; see also Bond v. United States, 529 U.S. 334, 338–39 (2000).

premises. Lyle and Dar were seized, assaulted, searched, and removed to a secure location. These searches and seizures were not reasonable manifestations of the statutorily permitted search to which persons consent when they enter a bar.[28]

### ii. Stops and Frisks Pursuant to Terry

Plaintiffs' allegations also make clear that the searches and seizures of the individual plaintiffs were not justified by the Terry stop-and-frisk exceptions to the probable cause and warrant requirements. In Terry, the Supreme Court held that an officer who lacks probable cause but who can "point to specific and articulable facts" that "reasonably warrant" the inference that "a particular person" is committing a crime may briefly detain that person in order to "investigate the circumstances that provoke suspicion." 392 U.S. at 21. The Supreme Court has time and again reiterated that the stop must be brief, minimally intrusive, and "'reasonably related in scope to the justification for [its] initiation.'" United States v. Brignoni-Ponce, 422 U.S. 873, 880–81 (1975) (quoting Terry, 392 U.S. at 29). An accompanying frisk for weapons is warranted if the officer can articulate specific facts and reasonable inferences that "he is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27. The search is "a limited protective search for concealed weapons," not a search to discover evidence of a crime. Adams v. Williams, 407 U.S. 143, 146 (1972). Overall, "[t]he manner in which the seizure and search were conducted

---

[28] We need not and do not decide whether § 14:95.4(A) applies to owners and employees of a bar because, in any case, the searches here were not justified by the statute. We also need not and do not decide the limits of reasonableness imposed on searches under this statute—i.e., whether they may be more intrusive than a Terry frisk—because of the extreme facts of this case.

is, of course, as vital a part of the inquiry as whether they were warranted at all." Terry, 392 U.S. at 29; see also Williams v. Kaufman County, 352 F.3d 994, 1004 (5th Cir. 2003) (holding unreasonable, and thus unlawful, the officers' prolonged, hand-cuffed detention of customers in a public commercial establishment).

In this case, the factual pleadings contain no particularized determinations by the deputy sheriffs that any of the individual plaintiffs were presently committing crimes or armed and dangerous. Moreover, as discussed above, the manner of the searches and seizures far exceeded the limited, non-threatening intrusions that Terry permits.[29]

### iii. Searches Incident to Arrest

Defendants also argue that they had the right to search Lyle, Dar, Erica, Christine, Mabou, and Jonathan incident to their arrests. Officers may perform searches incident to constitutionally permissible arrests in order to ensure their safety and safeguard evidence. Moore, 128 S. Ct. at 1607; United States v. Robinson, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." (quotation marks omitted)). A search incident to a custodial arrest, however, must be narrowly tailored. The search is limited to the area within the arrestee's immediate control and restricted to securing any weapons

---

[29] State v. Jackson, 809 So. 2d 198 (La. Ct. App. 2002), cited by defendants, is inapposite. Jackson upheld a search of an individual by a private security guard to whom the Fourth Amendment prohibitions against illegal searches do not apply. Id. at 200. The security guard then signaled a law enforcement officer that the person possessed either a weapon or drugs in violation of the law. Id. at 200–01. The law enforcement officer proceeded to conduct a permissible stop and frisk pursuant to § 14:95.4(A) and Terry. Id. at 202.

that the arrestee might use or evidence the arrestee might conceal. Chimel v. California, 395 U.S. 752, 763 (1969).

We have already concluded, based on the amended complaint, that defendants lacked probable cause to arrest Lyle, Dar, and Erica; therefore, the defendants' searches of them were not pursuant to lawful arrests. The same conclusion applies to the searches of Christine, Mabou, and Jonathan, which defendants argue were pursuant to seizures based on probable cause resulting in de facto arrests. Defendants have pointed to no particularized facts contained in the amended complaint supporting probable cause to lawfully arrest Christine,[30] Mabou, or Jonathan; thus, the searches of those three plaintiffs were not proximate to their lawful arrests.

Overall, on the facts alleged in the amended complaint, Slocum, Rauls, LaCour, and Doyle violated Lyle's, Dar's, Erica's, Olivia's, Christine's, Carley's, Mabou's, and Jonathan's Fourth Amendment rights by searching and seizing them without probable cause or one of its substitutes; thus, we must determine if those rights were clearly established at the time of the searches and seizures.

### b. Objectively Reasonable Conduct Under Clearly Established Law

Plaintiffs have alleged violations of Fourth Amendment rights that were clearly established in February 2006. Defendants do not contest that the Fourth Amendment's probable cause and reasonableness requirements; Terry's requirement of specific, articulable facts giving rise to reasonable suspicions that

---

[30] To the extent defendants assert that the presence of Olivia, Carley, and the other minor in the separate, private apartment provided defendants with probable cause to arrest Christine, our conclusion above that they lacked probable cause to arrest Erica applies with equal force to Christine.

criminal activity is afoot and that the suspect is armed and dangerous; the limited scope of Terry and similar weapons searches; and the necessity of a lawful arrest to conduct a search incident to arrest were well-established at that time. Nor have defendants presented any other basis on which to conclude that they acted reasonably. We thus conclude that Slocum, Rauls, LaCour, and Doyle are not entitled to qualified immunity for the searches and seizures of Lyle, Dar, Erica, Olivia, Christine, Carley, Mabou, and Jonathan. We affirm the district court's order denying qualified immunity to Slocum, Rauls, LaCour, and Doyle for these plaintiffs' Fourth Amendment unreasonable search and seizure claims.

4. First Amendment Violations

Hilton, Slocum, Rauls, and LaCour are entitled to qualified immunity for Club Retro, L.L.C.'s, Lyle's, and Dar's First Amendment free speech and association claims because plaintiffs have failed to plead a violation of their constitutional rights. The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble." This court has held that "[l]ive musical entertainment such as [a] [c]oncert is unquestionably speech and expression subject to the guarantees of the First Amendment." Collins v. Ainsworth, 382 F.3d 529, 539 (5th Cir. 2004) (citing Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989)); see also Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 65 (1981) ("Entertainment . . . is protected; . . . live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee."). To practice this freedom and "have access to live musical expression, the public must necessarily rely on concert promoters to make arrangements for musicians to perform." Cinevision Corp. v. City of Burbank, 745 F.2d 560, 568 (9th Cir. 1984); see also

Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 655 (1981) ("The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.'" (quoting Kovacs v. Cooper, 336 U.S. 77, 87 (1949))). In the concert setting, the First Amendment right to freedom of expression interacts with the right to freedom of assembly and association: "Implicit in the right to engage in First Amendment-protected activities is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" Collins, 382 F.3d at 539 (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984)). The right, which protects expressive association, however, does not protect chance encounters at a dance club that contain no element of expression. See City of Dallas v. Stranglin, 490 U.S. 19, 25 (1989); Roberts, 468 U.S. at 619; see also Wallace v. Tex. Tech Univ., 80 F.3d 1042, 1051–52 (5th Cir. 1996). Nonetheless, "[w]hen public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of [constitutionally impermissible] prior restraints [on the exercise of First Amendment rights] exists." Collins, 382 F.3d at 539 (citing Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)).

In this case, Club Retro, L.L.C., Lyle, and Dar allege two acts that purportedly infringed their First Amendment rights. First, on the night of the raid, "some of the Deputy Sheriffs were telling people that Club Retro, L.L.C. was going to be shut down, that people should not come back to Club Retro, L.L.C. and that, if they did come back to Club Retro, L.L.C., that Club Retro, L.L.C. would be raided again and they would be arrested." Second, the following weekend, on the night of Paul Wall's concert at Club Retro, a fire marshal and

two Rapides Parish deputy sheriffs entered Club Retro and stayed until the show began. Two other Rapides Parish deputy sheriffs conspicuously parked their cruisers in Club Retro's parking lot for the duration of the concert.

We conclude that plaintiffs have failed to plead a constitutional infringement. Statements by some deputy sheriffs that people should not return to the club do not constitute a prior restraint on any First Amendment rights. Plaintiffs were free to and did hold their concert the following weekend. They also continued to operate Club Retro on subsequent weekends without government officials exercising any control over their speech.[31] Patrons were free to and did attend. Similarly, the passive attendance and visibility of the deputy sheriffs at Club Retro before and during the Paul Wall concert was not a violation of First Amendment rights. The deputy sheriffs had every right to attend the show and park in the parking lot just as any other patron. See Lewis, 385 U.S. at 211; Dobard, 824 So. 2d at 1133. The concert proceeded as scheduled, and the amended complaint does not allege that the deputy sheriffs interfered so as to prevent any persons who wanted to attend from attending.[32] Moreover, plaintiffs have not alleged that Hilton, Slocum, Rauls, or LaCour were personally involved in the events on the night of the Paul Wall concert.

---

[31] We address only plaintiffs' First Amendment claims: plaintiffs' state-law business interference claims and related injuries are not before us.

[32] Thus, Collins is inapposite. In Collins, the sheriff first asked concert organizers to cancel their planned 2 Live Crew concert; when the organizers refused, the sheriff organized two driver's license checkpoints near the entrances to the concert venue. 382 F.3d at 545. After the members of 2 Live Crew and many concert goers were stopped at the check-points, 2 Live Crew did not perform. Id. at 535. Although the checkpoints were "facially valid," the court held that the sheriff abused his authority by using the checkpoints for his intended and stated purpose of denying the use of the venue for a concert. Id. at 545. Here, there are no allegations that defendants physically interfered with potential concert attendees.

Therefore, defendants are entitled to qualified immunity because plaintiffs have not alleged that any of the defendants denied Club Retro, L.L.C., Lyle, or Dar use of Club Retro for First Amendment protected expression.  We reverse the district court's order on this claim.

5.  Equal Protection Violations

Hilton, Slocum, Rauls, and LaCour are entitled to qualified immunity for plaintiffs' Fourteenth Amendment equal protection claims because plaintiffs have failed to allege either an intent to discriminate or unequal treatment.  The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  This "Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'"  Qutb v. Strauss, 11 F.3d 488, 492 (5th Cir. 1993) (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)).  To maintain an equal protection claim, a plaintiff typically alleges that he "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent."  Taylor v. Johnson, 257 F.3d 470, 473 (5th Cir. 2001); see In re United States, 397 F.3d 274, 284 (5th Cir. 2005); Beeler v. Rounsavall, 328 F.3d 813, 816–17 (5th Cir. 2003); Rolf v. City of San Antonio, 77 F.3d 823, 828 (5th Cir. 1996).

Plaintiffs' amended complaint alleges that they have been discriminated against based on Lyle's and Dar's Creole ethnicity and Club Retro's mixed-race clientele.  Plaintiffs allege four facts that they claim are sufficient to state a claim of racial discrimination:  (1) the racial makeup of the Club's owners, employees, and patrons compared to that of the predominately Caucasian Rapides Parish Sheriffs Department; (2) unnamed deputy sheriffs' use of racial

epithets; (3) the absence of similar raids against GG's, a white-owned nightclub that caters to white patrons;[33] and (4) statistics showing Operation Retro-Fit yielded few arrests. These allegations fail to carry plaintiffs' burden of alleging facts showing unequal treatment or discriminatory intent on the part of the planners of Operation Retro-Fit. See Twombly, 127 S. Ct. at 1965, 1974.

We strongly condemn the use of racial epithets; however, the usage alleged here is not probative of disparate treatment or discriminatory intent. Plaintiffs have alleged generally that "[t]he crowd was . . . insulted with profanities and racial slurs" and specifically that Slocum said to Erica, "And you think you are White? You are not F---ing White." In Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999), this court held that "an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation." The court explained that:

> When leveled against a citizen by a police officer, a racial epithet, by its nature, calls attention to the citizen's racial identity. The use of an epithet is therefore strong evidence that a comment or action is racially motivated. The question in the equal protection context, however, is not just whether the conduct is racially motivated but also whether that action deprives a person of "equal protection of the laws." Where the conduct at issue consists solely of speech, there is no equal protection violation.

Id. (citation omitted). As deplorable and reprehensible as the use of racial profanity is, particularly in the context of intrusive displays of official police authority, plaintiffs have not alleged that any defendant made a statement that

---

[33] According to the amended complaint, GG's is located about one-half mile up the road from Club Retro. Defendants argue that, unlike Club Retro, GG's is within an incorporated municipality and thus not subject to Rapides Parish ordinances. Because GG's location is an issue of fact, we assume for our present analysis that GG's was in the same jurisdiction as Club Retro.

he targeted Club Retro because it was minority-owned and attracted a mixed-race and mixed-ethnicity crowd.

Next, plaintiffs allege that GG's has not been raided. This allegation is insufficient to show disparate treatment where plaintiffs have failed to allege any facts showing that GG's was similarly situated. Moreover, prior to Operation Retro-Fit, Club Retro had likewise not been raided; thus, we can draw no inference of disparate treatment: "[t]he first club raided had to be either black-owned or white-owned, and that it was one instead of the other proves nothing." Swint, 51 F.3d at 1000. Finally, we note that the differences in the racial or ethnic makeup of the respective parties and the post-operation statistics showing Operation Retro-Fit yielded few drug arrests are not probative, without other allegations, of unequal treatment or discriminatory intent.

Thus, defendants are entitled to qualified immunity on plaintiffs' equal protection claims, and we reverse the district court's order in that regard.

## C. Dismissal Without Prejudice

Finally, we lack jurisdiction to review an appeal of the district court's order granting without prejudice the motion to dismiss the substantive due process claims based on qualified immunity. Section 1291 vests us with jurisdiction over "all final decisions of the district courts." In most cases, "an order is final only when it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" Coopers & Lybrand v. Livesay, 437 U.S. 463, 467 (1978) (quoting Catlin v. United States, 324 U.S. 229 (1945)). However, "a decision 'final' within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case." Gillespie v. United States

Steel Corp., 379 U.S. 148, 152 (1964). Among the exceptions to the general rule are orders that "fall in that small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949). Under the Cohen collateral order doctrine, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell, 472 U.S. at 530 (emphasis added). A district court's order granting qualified immunity, however, typically does not qualify under the Cohen collateral order doctrine because the order is "capable of being fully and effectively reviewed after final judgment." Thompson v. Betts, 754 F.2d 1243, 1246 (5th Cir. 1985); cf. United States v. Day, 806 F.2d 1240, 1242 n.8 (5th Cir. 1986) (noting "that a dismissal without prejudice of a criminal indictment does not generally fall within the collateral order exception to section 1291" because "no important right of [the defendant's] is irreparably foreclosed from review"). One could argue that when granted without prejudice, a dismissal is not a complete victory for a defendant, in that the defendant remains subject to the risk of suit and is not "home free." As such, the plaintiff's ability to file a new suit could risk "inhibition of [the official's] discretionary action . . . and deterrence of able people from public service"—the very harms that the doctrine of qualified immunity seeks to avoid. Mitchell, 472 U.S. at 526; see also Jacquez, 801 F.2d at 792 ("[I]f the protections afforded public officials are not to ring hollow, plaintiffs cannot be allowed to continue to supplement their pleadings

until they stumble upon a formula that carries them over the threshold."). This concern is unfounded. Even though the district court dismissed the substantive due process claims without prejudice, defendants simply do not face discovery, trial, liability, or any other costs of suit related to such claims. Hilbun v. Goldberg, 823 F.2d 881, 883 (5th Cir. 1987) ("A federal court that dismisses without prejudice a suit arising from a federal statutory cause of action . . . leaves the parties in the same legal position as if no suit had ever been filed."). If the case proceeds in its current posture, defendants' rights to be free from the burdens of suit for which they are entitled qualified immunity will be vindicated without further action from any court. If and only if plaintiffs move to amend their complaint or file a new complaint, and the district court permits them to proceed over defendants' continuing assertion of qualified immunity, will defendants face the burdens of discovery or trial on the substantive due process claims. Thus, accepting jurisdiction and deciding the case at this time would be a fundamentally speculative enterprise.[34] We therefore dismiss for lack of appellate jurisdiction defendants' appeal of the district court's order dismissing the substantive due process claims without prejudice.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND. We AFFIRM the district court's order denying qualified immunity

---

[34] Moreover, our jurisdiction is closely circumscribed only to legal questions. See Johnson, 515 U.S. at 313–315; Atteberry, 430 F.3d at 251–52. Because the district court is best situated to determine when plaintiffs have had sufficient opportunity to state their best case, we review the district court's decision to grant a motion to dismiss with or without prejudice only for abuse of discretion. See Schiller v. Physicians Res. Group Inc., 342 F.3d 563, 567 (5th Cir. 2003). We cannot conclude that, in this case, such a decision turns on a purely legal question.

for plaintiffs' Fourth Amendment claims with respect to the raid on Club Retro and the searches and seizures of Lyle, Dar, Erica, Olivia, Christine, Carley, Mabou, and Jonathan; and denying qualified immunity for Erica's Fourth Amendment false arrest claim; and dismissing plaintiffs' due process claims without prejudice. We AFFIRM on different grounds the district court's order denying qualified immunity for Lyle's and Dar's Fourth Amendment false arrest claims. We REVERSE the district court's order denying qualified immunity for Club Retro's, Lyle's, and Dar's First Amendment claims; and denying qualified immunity for plaintiffs' Fourteenth Amendment equal protection claims. We DISMISS the appeal of the district court's order dismissing plaintiffs' substantive due process claims without prejudice. We REMAND to the district court for proceedings not inconsistent with this opinion. Defendants-appellants shall bear the costs of this appeal.